**ALAFOSS, h. f., Plaintiff,**

v.

**PREMIUM CORPORATION OF AMERICA, INC., Defendant.**

Civ. No. 4–74–527.

United States District Court,
D. Minnesota,
Fourth Division.

March 16, 1978.

P. Sveinbjorn Johnson, Johnson & Martin, Chicago, Ill., Robert W. Gislason, Edina, Minn., for plaintiff.

J. Patrick McDavitt, Joel H. Gottesman, Levitt, Palmer, Bowen, Bearmon & Rotman, Minneapolis, Minn., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

MacLAUGHLIN, District Judge.

Based upon the evidence adduced at trial * and upon all of the files, records and proceedings herein, the Court finds as follows:

### FINDINGS OF FACT

1. Plaintiff, Alafoss, h. f., (Alafoss) is a corporation organized and existing under the laws of the Republic of Iceland and at all relevant times was engaged in the export and sale of garments and other products made from the fur and wool of Icelandic sheep. Alafoss' principal office and place of business is in the Republic of Iceland.

2. Defendant and counterclaimant, Premium Corporation of America, Inc. (PCA) is a corporation organized and existing under the laws of the State of Minnesota and at all relevant times was engaged in various business activities, including the sale of goods through direct mail marketing programs. Its principal office and place of business is in the State of Minnesota.

3. This Court has jurisdiction over the parties and has jurisdiction over the subject matter of the action by virtue of diversity of citizenship, and the amount in controversy exceeds $10,000.

4. Icelandic Imports, Inc. is a corporation located in New York City and at all relevant times was an agent of Alafoss, which owned approximately 30 percent of the shares of stock of Icelandic Imports, Inc. Certain officers of Alafoss were members of the board of directors of Icelandic Imports, Inc. during the times in question in this case.

5. From October, 1971, through January, 1974, PCA purchased a variety of women's coats from Alafoss or from Alafoss' agent in the United States, Icelandic Imports, Inc. PCA thereafter marketed a number of these coats for direct mail programs with the American Express Company, utilizing American Express' list of credit card holders.

6. In 1972 PCA purchased 40,000 "curly coats" from Icelandic Imports, which had been imported from Alafoss for a mailing to American Express card holders.

7. During the spring and summer of 1972 a PCA designer worked with Alafoss employees and representatives in developing a full-collared wrap-around coat, hereafter "wrap coat," for the purpose of resale by PCA in its mail marketing business to American Express card holders, hereafter, "the Amexco" program. The body of the coat was to be all white wool with a detachable white fur collar made from the fur of Icelandic sheep.

8. Samples of the wrap coat were supplied by Alafoss to PCA in each of sizes eight through sixteen. These sample wrap coats had full collars of a solid white color without perceptible yellowing and of a full, silky texture. In or about July, 1972, PCA approved these samples, and Alafoss represented to PCA that it could supply coats in conformity to the samples and in the quantities needed by PCA for its resale in the Amexco program. The sample was part of the basis of the bargain, was relied upon by PCA including the color and quality of the sample wrap coats and fur collars supplied by Alafoss, and an express warranty was created that the whole of the goods would conform to the sample.

9. Alafoss provided PCA with samples of the wrap coat to be photographed for

---

* Plaintiff's trial exhibits 5 and 6 were provisionally received into evidence during the trial. For purposes of this decision, plaintiff's trial exhibits 5 and 6 are received in evidence except for that part of the correspondence included in those exhibits which clearly relates to the curly coat as distinguished from the wrap coat.

mail brochures to be used in the Amexco program. Pictures of the coat were taken in or about August, 1972, and were included in the sales brochure to be mailed to prospective customers. The color and texture of the fur collar shown in the sales brochure is the same as the color and texture of the fur collars on the sample coats.

10. PCA purchased 750 wrap coats for purposes of conducting a test mailing. All of these coats conformed to the approved samples.

11. On or about January 23, 1973, and on the basis of the approved sample, PCA, Icelandic Imports (acting for Alafoss) and American Express entered into a written agreement providing for a full mailing of the wrap coat to take place in the fall of 1973. Icelandic Imports was to be the agent of Alafoss for purposes of the contemplated sale of the wrap coats to PCA and the agreement incorporated a copy of the sales brochure to be used in the full mailing of the wrap coat.

12. A copy of the January 23, 1973, agreement, along with the sales brochure, was received by Alafoss which made no objection to PCA with respect to the photographs of the wrap coat in the brochure.

13. PCA issued its purchase orders for the wrap coat on March 9, 1973, and October 10, 1973, for 7,200 and 1,025 coats, respectively. The price per coat F.O.B. Iceland was $63.00; the landed cost per coat at PCA's warehouse in Chicago was $88.11. The terms of the purchase orders provided that Alafoss warranted and guaranteed to PCA that the wrap coats were "fit . . for the purpose for which such merchandise is intended to be used." The purchase orders were also issued by PCA on the basis of the approved samples.

14. Over the period from August, 1973, through September, 1973, PCA mailed the sales brochure to approximately 3,400,000 American Express card holders, offering the coat for $199.90 plus $3.95 for shipping and handling. Alafoss knew that the brochure would be sent to prospective customers for purposes of PCA's resale of the wrap coats, and PCA relied on Alafoss to select and ship wrap coats which conformed to the samples approved by PCA, which were fit for PCA's resale purposes and which appeared as represented in PCA's mailing brochure.

15. In October, 1973, after PCA had filled a number of orders, it discovered that a large number of the fur collars had a significant yellow discoloration and an unattractive appearance. By the end of October, 1973, it was apparent that the fur collars of the wrap coats remaining in PCA's stock, approximately 4,350, did not conform to the samples. Further, approximately 1,400 coats had loosely sewn pockets. Some of the collars were sent by PCA to Mademoiselle Furs, a New York furrier, which purported to have a process which would improve the appearance of the collars.

16. In October, 1973, PCA and American Express notified officers of both Alafoss and Icelandic Imports of the discoloration and other problems with the quality of the fur collars, and the problem with the pockets. Alafoss sent representatives to New York on its behalf to examine the fur collars sent to Mademoiselle Furs and officials of PCA and Alafoss agreed that the collars on all of the coats would be removed and sent to Mademoiselle Furs for treatment at a cost of $5.55 per collar. PCA authorized Mademoiselle to treat approximately 4,350 of the fur collars at a total cost of $24,186.90 which was paid by PCA to Mademoiselle Furs. An additional expense incurred by PCA, approved by Alafoss, was in the amount of $2,800 for the cost of sewing loose pockets.

17. The treatment appeared to cure the nonconformities in the collars and, after completion of the treatment of the collars by Mademoiselle, PCA used the treated fur collars to fill its customers' orders. A yellow gummed dot was placed in the lining of each collar by PCA's employees so that the treated collars could later be identified.

18. PCA became aware in early 1974 that a large number of wrap coats with yellow and ragged collars were being re-

turned by customers and the president of Alafoss was informed of the problem at a January, 1974, meeting with PCA officials. The collars on the returned coats could not be distinguished on the basis of whether they had been treated by Mademoiselle and the treatment did not change the color of the fur but only temporarily improved its appearance.

19. Over 4,000 nonconforming wrap coats were in PCA's possession in mid-March, 1974, and, at or near that time, PCA informed Alafoss of the extent of the non-conformities and made a demand against Alafoss for damages arising out of PCA's inventory of wrap coats with nonconforming fur collars.

20. In June, 1974, PCA detached the collars from the coats in inventory and drew a random sample of 112 collars. The evidence clearly established that the random sample is representative of the coats of the approximately 4,000 wrap coats in inventory in March, 1974, and the random sample does not conform in color or quality to the sample coats approved by PCA in 1972 and which were a basis of the bargain.

21. PCA made attempts to sell the remaining stock of wrap coats and on June 12, 1974, a letter was sent by PCA's vice president to Alafoss' president stating that "because of these defects and discoloration, the best offer we have been able to obtain after a substantial effort on our part is $25 per coat. Please be advised that unless you advise us of an acceptable offer of a higher price by June 17, 1974, we intend to accept this offer." PCA proceeded to sell 3,736 wrap coats to Alden's, Inc., a Chicago-based company, for approximately $20 per coat. After certain credits and chargebacks the net payment to PCA from Aldens was $71,-740. However, the letter written by PCA to Alafoss on June 12, 1974, and other evidence establishes that a fair sales price for the coats would have been $25. Therefore, PCA should have received an additional $18,680 net payment for the coats for a total of $90,420.

22. As of June, 1974, PCA was liable to Alafoss in the amount of $132,470 for un-paid wrap coats purchased by PCA from Alafoss.

23. The evidence is not sufficient to establish that a rerun of the wrap coat promotion would have been successful even if the remaining wrap coats had conformed to the samples approved by PCA. Therefore, it would be inappropriate to award PCA any damages for lost profits.

24. The measure of damages for breach of warranty, pursuant to Minn.Stat. 336.2–714 is "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." The evidence does not establish such special circumstances to justify a different measure of damages. The value of the wrap coats as warranted to PCA was $88.11 at the time and place of delivery, this being the landed cost for each coat delivered to PCA's Chicago warehouse. The value of the nonconforming wrap coat at such time and place is $25 per coat. PCA has sustained damages as a result of the diminution of the value of the nonconforming wrap coats as follows:

| | |
|---|---|
| Value of the wrap coats as warranted ($88.11 × 3,736) | $329,178.96 |
| Less value of the 3,736 nonconforming wrap coats | − 90,420.00 |
| Difference in Value | $238,758.96 |
| Less amount due from PCA to Alafoss on purchase price | − 132,470.00 |
| Amount due PCA from Alafoss | $106,288.96 |

In addition, Alafoss owes PCA $26,986.90 as the cost paid to Mademoiselle Furs by PCA, with the consent of Alafoss, in an attempt to cure the discoloration of the fur collars, and other defects in the coats.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the persons and the subject matter of this action.

2. The contract of sale between PCA and Alafoss for the sale of the wrap coat consisted of the January 23, 1973,

agreement, accepted by Alafoss, PCA's purchase orders and Alafoss' acceptance of such orders. Further, the samples of the wrap coats were made a part of the basis of the bargain and created an express warranty that the whole of the goods would conform to the sample or model.

3. At the time of the contract Alafoss was aware that PCA was relying on Alafoss to select and furnish goods which would conform to the sample and which would be fit for PCA's particular purpose. In addition to a warranty of sample, an implied and express warranty of fitness for a particular purpose and use was created.

4. Alafoss breached the express warranty created by sample and the express and implied warranty of fitness for a particular purpose by its delivery of at least 3,736 wrap coats which did not conform to the samples and which were not fit for PCA's resale in its direct mail business. Proper notice was given by PCA to Alafoss of the breach of these warranties.

5. PCA has sustained damages in the amount of $238,758.96 as a result of Alafoss' breach of warranties. Further, PCA has incurred incidental damages in the amount of $26,986.90 in its attempt to remedy the nonconformities, for a total amount of $265,745.86.

6. PCA is liable to Alafoss in the sum of $132,470.00 for unpaid merchandise.

7. PCA is entitled to a net judgment against Alafoss in the sum of $133,275.86 together with interest and costs.

IT IS ORDERED that judgment be entered for defendant Premium Corporation of America, Inc. against plaintiff Alafoss, h. f. in the amount of $133,275.86 plus costs, and interest from the date of judgment.