CROOK MOTOR COMPANY,
INC., Plaintiff,

v.

J.W. GOOLSBY, Defendant/Third–Party
Plaintiff,

v.

James H. CREGAR, Jr., et al.,
Defendants/Third–Party
Defendants.

Civ. A. No. WC 84–72–D–D.

United States District Court,
N.D. Mississippi, W.D.

Dec. 21, 1988.

Talmadge D. Littlejohn, New Albany, Miss., for plaintiff.

J.E. Boone, New Albany, Miss., for defendant J.W. Goolsby.

Omar D. Craig, Oxford, Miss., for third-party defendants James H. Cregar, Jr., Jim Cregar Corp., Buddy Simmons and Nat. Gen. Ins. Co.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

### I. *Findings of Fact*

Plaintiff, Crook Motor Company, Inc., a North Carolina corporation which has its principal place of business in Albemarle, North Carolina, filed suit against J.W. Goolsby of Myrtle, Mississippi. The defendant in turn impleaded James Cregar and Jim Cregar Corporation of Oxford, Mississippi; Charles D. "Buddy" Simmons of Water Valley, Mississippi; and National General Insurance Company. The suit concerns the sale of a truck tractor, sold by Goolsby to plaintiff and then resold by plaintiff, title to which was later discovered to be flawed. The truck, from some time prior to its sale to Crook Motors until it was confiscated by the FBI in February 1984, bore vehicle identification number (VIN) 1FUPYSYB6CP207957 (hereafter 207957). Crook Motors sues these defendants to recover the amount it has lost as a result of its purchase and resale of that truck including the purchase price of $48,000 paid to defendant Goolsby for the truck, plaintiff's lost profit on the subsequent sale of the vehicle to Battle Creek Ford, and damage to its business reputation, together with punitive damages, legal fees, costs, and interest.

Jurisdiction is based on 28 U.S.C. § 1332; it appears to this court that there exists in this court complete diversity of citizenship between the plaintiff and all defendants, and that the amount in controversy, exclusive of interest and costs, exceeds the prerequisite $10,000 amount.

On June 15, 1983, a red 1982 Freightliner "conventional" tractor, bearing true VIN 1FUPYDYB6CH206409 (hereafter 206409) was reported stolen. The truck was owned by Steven Droke of Hornersville, Missouri, and at the time of the theft was being driven in connection with the business of Droke Brothers Trucking. The truck had been stolen on June 9, 1983, from the custody of a driver for Droke Brothers in West Memphis, Arkansas.

On July 12, 1983, Mr. Buddy Simmons purportedly[1] sold to Mr. J.W. Goolsby a black[2] 1982 Freightliner "conventional" tractor, in need of a few additional components, for $30,000.00. Mr. Simmons is now a licensed dealer in salvage parts; at the time of the sale of the 1982 Freightliner to Mr. Goolsby, Mr. Simmons was unlicensed, and had been in the salvage business in his back yard for only eight to nine months.

---

**1.** Mr. Goolsby, unemployed at the time, testified that he put $40,000 in cash into his pocket, and without calling went to Cregar's place of business to see if Mr. Cregar had a truck to sell. Mr. Cregar did not. While there, Mr. Goolsby came across Mr. Simmons, who did have a truck "near completion" at his house in Water Valley. Those two allegedly went to view the truck, which at the time was painted red. Neither man made any mention of this transaction on their taxes in that or any subsequent year, nor were any receipts prepared or kept. There is some question as to whether the purported sale of the truck was a sham; the court however declines to so find based on the evidence presented.

**2.** Buddy Simmons testified that he took the blue cab and sleeper that he purchased from Memphis Freightliner, painted them with a reddish primer coat, then painted the back of the cab and the front of the sleeper black before putting them together on the frame. Barry Simmons, son of the defendant, testified that he helped his father on July 4, 1983 put the cab onto the frame. Barry testified that the cab was a reddish brown color. He did not mention that one side of the cab was painted black at that time. Buddy Simmons then put the sleeper on the frame himself, and testified that he attempted to paint the rest of the truck black. The paint job did not turn out properly, so Simmons sanded it off, and applied a new coat of primer. On July 12, Goolsby came to see the truck, which he testified at that time was "red" or "winish red." He did not mention any black paint between the cab and sleeper. Later, on July 12, Goolsby and Simmons went to Jim Cregar's office where Simmons and Cregar filled out a title application for Goolsby's signature which stated that the color of the truck was black. Goolsby testified that he held the truck for about a month before having it painted, but guessed that he must have mentioned his plans to paint it black to Simmons. Further, the testimony at trial from Robert Barringer, the Crook Motor salesman, was that the truck had red paint under the "rubbers." Also, Reynauld, the agent with the National Automobile Theft Bureau, testified that there was red paint under the black paint, and the photographs which he took show bright red paint where the black paint has chipped away around the hood, with no sign of a primer coat of a duller red.

He occasionally drove a "lowboy" truck for Mr. Cregar, collecting wrecks and salvaged parts which Mr. Cregar had purchased, and receiving as compensation for his services his pick of the salvaged parts at Cregar's place of business. Simmons also bought salvage on his own account and occasionally these trips were for both Cregar's and his own benefit. These transactions between the two men were strictly cash and no records were kept; nor were any records kept of where individual parts came from. Mr. Simmons claims that he took salvaged parts and built the truck which he sold to Goolsby. At this time, Mr. Simmons had no building in which to work, but was working outside. He testified that he was not sure how many other trucks he had built prior to that time, either one or two, nor did he recall who purchased those trucks. Mr. Simmons claims that he cut and welded the frames from two wrecked trucks to make the frame for the truck he sold to Goolsby, in the spring of 1983. He presented the testimony of the welder he employed to the effect that he did make such a weld for Simmons at about that time. Simmons also bought a salvaged cab and sleeper from Memphis Freightliner, and allegedly used the VIN from that cab on the title and the bill of sale, 207957. Mr. Simmons claims ignorance of how that cab number happens to match the number on the frame rail, which number was later found to be a restamp over the original VIN. Simmons further claims ignorance of how a forged specifications sheet came to be attached to the cab, which described VIN 207957 as having all the components of the truck as it then existed.[3] Further, on Goolsby's title application, Cregar wrote down a prior Mississippi title number, 3583508-1-01. None of the defendants could recall at trial where that number came from. On the other application, he wrote no prior number, but marked the application as referring to a used truck. Having purchased the cab and sleeper as salvage, Simmons claims he took the VIN from one or two removable decals in the cab, and submitted those to the Mississippi Department of Motor Vehicles as the true VIN for the truck, not indicating that said truck was rebuilt from salvage nor indicating that another whole truck, bearing that VIN from the factory, was or could be still in existence elsewhere.[4]

The court finds it incredible that an inexperienced salvage dealer with limited resources and with no shop, shed, or enclosure built a completed truck from scratch out of wrecked parts in just 30 to 45 days; it is especially unbelievable that such a truck could then cause a salesman, who had over 20 years experience with a large used truck dealer, to remark that it was the most beautiful truck that he had ever seen. The likelihood of odd parts being put together to make a truck which could fool subsequent buyers and investigators into believing it to be a "whole" truck is very low. And finally, that such a truck built out of used parts from a myriad of other wrecked trucks could run well with few problems[5] is particularly incredible.[6] Thus, due to the inconsistencies in testimony, the demeanor of the witnesses, and the incredible nature of defendant's theory of the case, this court finds that Buddy Sim-

3. Subsequent investigation revealed that the specification sheet was a forgery, that Freightliner microfiche records of the truck with VIN 207957 (owned by the Tisches) had substantially different specifications, and that the sheet included a misprint of the truck model number.

4. Mr. Simmons also put on his son, Barry Simmons, who was living at home while the truck was allegedly being built in the back yard, but his testimony was of no assistance to the court. It is interesting to note, however, that Barry Simmons claims to have seen the truck during its construction only twice.

5. Mr. Goolsby is the only one who reported any problems with the truck at all, that being the transmission and the alternator. Mr. Dorsey Ferguson encountered no problems with the truck while driving it from North Carolina to Michigan before purchasing it, and was sufficiently satisfied with the truck's performance that even after it had been confiscated by the FBI as a stolen truck, he was willing to repurchase it from the insuror.

6. This, according to witnesses for both sides, is precisely why the market price for rebuilt and "kit" trucks is substantially lower than that for "whole" trucks.

mons did not build such a truck from salvaged parts.[7] Prior to the sale to Goolsby, Simmons had already been refused a title on the truck, so he attempted to bond his title. He was informed by the bonding company, National General, that he was not financially "strong enough", and that he needed to get someone else to bond it for him. He called the insurer's agent in Oxford, Mississippi, and arranged through him to have Jim Cregar use his bond for the title to this truck. Thus, National General Insurance Company issued a title bond in the amount of $36,000 on the strength of which Simmons was granted title by the State of Mississippi. This application for title was filled out by Buddy Simmons on July 12 at the time he, Goolsby and Cregar were filling out a title application in the name of J.W. Goolsby for the same truck. The same truck which was sold to Goolsby by Simmons, with some cosmetic work such as painting and additional accessories, was sold to Crook Motors on September 15, 1983. On September 12, 1983 while on his first delivery trip with the truck, Goolsby stopped across the street from Crook Motors in Albemarle, North Carolina. He was experiencing alternator problems and purchased an alternator from the part shop operated by Crook Motors. He replaced the alternator and then asked a salesman for help in jump-starting the truck. Robert Barringer, a salesman with over 20 years experience with Crook Motors, went to help, and remarked that the truck was the most beautiful he had seen. He asked Goolsby if he would consider selling the truck, was told that he might, and so Barringer proceeded to inspect the truck. Bar-

ringer testified that the truck was black, with black paint on the frame rails, but that there was red paint "under the rubbers." Barringer was of the opinion that the truck was a "whole truck" (i.e. factory-built), as the major components had the Freightliner logo. Goolsby told him that the truck was not a "glider kit" (a truck rebuilt onto a factory-issued frame) [8] and also gave no indication that the truck was rebuilt. Barringer testified that he was worried that the truck might be a "kit", because that would seriously diminish the truck's value. Goolsby and Barringer struck a bargain for $48,000, and Goolsby promised to return with the truck within the week to finalize the transaction when he received his title from the State of Mississippi. In the course of his inspection, Barringer checked the VIN on the decal in the cab against that on the left front frame rail[9], and saw that the numbers matched.

After Goolsby left, Barringer called Freightliner to see if the truck with VIN 207957 was a "kit" and was informed that it was a whole truck, but was also told in passing that it had a Caterpillar 3046 model engine. When Goolsby returned on September 15, 1983, Barringer asked him about the engine. Goolsby responded that he had swapped engines with his brother because he preferred a Cummins' engine. Barringer had a photograph taken of the truck that day, in the same location that Goolsby had parked it. Barringer testified, and this court so finds, that the same truck which Crook Motors purchased from J.W. Goolsby on September 15, 1983, cleaned up and with the right windshield replaced, was sold to Battle Creek Ford, of Battle Creek,

---

7. Defendants have argued at length concerning differences in components between the various trucks (i.e., the stolen Droke truck, the truck "built by Simmons", and the Tisch truck with true VIN 207957) and the truck impounded by the FBI and identified as the stolen Droke vehicle. To the extent that such comparison of components are made with the truck as "built" by Simmons, such evidence is disregarded.

8. Goolsby's testimony at trial on this point varied widely. He alternately claimed that Simmons did not tell him it was a wrecked and rebuilt truck and so he did not tell Barringer;

and that he knew the truck was rebuilt, and made a point to tell Barringer not only that the truck had been wrecked and rebuilt but also who had rebuilt it.

9. Barringer stated that the numbers of the rail were lined up, and that he saw no evidence of grinding. He also testified, as did the law enforcement officers, that the frame was painted. Further, on cross-examination, Barringer testified that he could not recall precisely what the specifications decal in the cab said, at least as far as to recall the engine type.

Michigan, for $54,000.00.[10] Battle Creek Ford had sent a salesman to Crook Motors with a prospective buyer, Mr. Dorsey Ferguson of Dyer, Indiana, who purchased the truck two to three days later on September 26, 1983, from Battle Creek Ford for $69,793.00. The truck was in the possession of Mr. Dorsey Ferguson from September 26, 1983 to February 24, 1984 when he brought the truck to Crook Motors for inspection by Sgt. William Sunday of the Criminal Investigation Section, Auto Theft Unit of the Michigan State Police, Special Agent Pamela Reyburn of the Federal Bureau of Investigation, and John Reynauld of the National Auto Theft Bureau.[11] The FBI had received a report that this truck might be a stolen truck; after examination of the truck on February 24, and February 29, 1984, by the three investigators, they determined it to be a stolen vehicle, and indeed to be the stolen Droke truck.[12, 13]

**10.** Defendants put on considerable evidence attempting to show that the truck depicted in the photograph, and which Crook Motors sold to Battle Creek Ford, was not the same truck that defendant Simmons sold to defendant Goolsby or defendant Goolsby sold to Crook Motors. They cross-examined Robert Barringer on individual components recalled from his examination of the truck. Consistent with his interest in the truck, he could recall few of the lesser components. Defendant Goolsby testified in detail regarding the accessories on his truck, but when presented with the photograph on cross-examination could only state that there seemed to be less space between the sleeper and the quarter panel on his own truck, and that the front bumper had a center light hole above the hole for the license tag which was slightly larger but "close to the same size" as on his truck. Defendant Goolsby introduced the testimony of Mr. Hershel Wilson, a truck driver, who had seen Goolsby's truck during the first week in August 1983 and had considered buying it. He testified that the truck was either black or blue at the time, but had been newly painted. He further testified that the truck in the photograph was not the same as the truck he saw at Goolsby's, due to several alleged differences in specific accessories. It is hard to credit the testimony of a man regarding the bug shield configuration and the sun visor on a truck which he had seen for less than an hour over five years previously, especially when that man was not certain even of the color of the truck at that time.

**11.** Defendants further introduced detailed evidence of accessories on the truck sold by Goolsby in an attempt to show that the truck inspected by the FBI, Michigan State Police, and National Auto Theft Bureau on February 24, 1984 and February 29, 1984 was not the same truck sold to Crook, or sold by Crook to Battle Creek Ford. They compared the accessories testified to by the law enforcement officers and the agent from the National Auto Theft Bureau, with those testified to by defendant Simmons and Goolsby and by Hershel Wilson (see note 9, supra). Further, defendant Simmons testified that he viewed the truck some period of time after it was impounded, after the truck had been confiscated, returned to its owner, resold to Battle Creek Ford, and by them back to Dorsey Ferguson and then wrecked and repossessed. This evidence, while admissible, is of extremely limited probative value. After balancing the credibility of the witnesses, and taking into consideration the fact that the accessories discussed were admittedly interchangeable, the court finds that the truck impounded by the FBI at Battle Creek Ford on February 24, 1984 was the same truck that was sold to Crook Motors by Goolsby and by Crook Motors to Battle Creek Ford and subsequently sold to Dorsey Ferguson.

**12.** Defendants finally attempted to show that the truck impounded was not the stolen Droke truck, again by comparison of interchangeable accessories. The court is nonetheless convinced that the impounded vehicle is substantially the same as the stolen Droke vehicle. It is completely consistent with plaintiff's theory of the case for a dealer in truck parts, such as Simmons, who has claimed experience in building trucks from scratch, to exchange minor or major components of the stolen Droke truck with those from other trucks, in an attempt to hamper identification.

**13.** Defendants rely heavily on the statement by Mr. Droke in his deposition that, in an accident prior to the theft, the hood was damaged and was replaced. If that were the Droke vehicle, they claim, then there could not be a VIN 206407 on the hood. The court is unconvinced by this line of defense. First, there has been testimony adduced at trial that the hood of a Freightliner truck is made in two parts, a metal covering and a fiberglass insert. The Droke deposition refers to the accident as causing damage to the sheet metal only. If the sheet metal outside of the hood were replaced, the VIN, which was appended to the fiberglass insert, would not be affected. Further, however, the court is of the opinion that the hood was not replaced following that accident; the statement made by Mr. Droke in his deposition is apparently inaccurate. The statement was made once, in passing, while listing briefly those articles damaged in the accident. For whatever reason, plaintiff's attorney Littlejohn was late for the deposition, and did not arrive until after this testimony was given; the testimony therefore was not subject to cross-examination by

The investigators examined the truck in detail[14] and discovered several VIN and serial numbers altered or removed. The VIN on the left frame rail, 207957, was misaligned and the numerals oversized. Further tests showed conclusively that the original VIN had been obliterated, probably by means of an oxyacetylene torch, hammering and grinding[15] and a new, false VIN handstamped over the old VIN. The engine identification plate was missing, and according to testimony, had been missing since before the truck was purchased by Crook Motors. The engine serial number, stamped on the exterior of the engine, was a restamp;[16] the VIN on the hood[17] was that of the Droke vehicle, as was that inside the upholstery on both seats in the cab. VINs commonly placed in the liners of the cab and sleeper were missing, and there were marks of rubbing with solvents where those numbers should have been.

Often the manufacturer would put the VIN on a piece of tape on the back of the speedometer, but that identifying feature was not in place on this truck. Officer Sunday searched the right frame rail for the VIN which was supposed to be there. He mistakenly removed the paint from one entire side of the rail; he saw no signs of welding. He then removed the paint from the area where the VIN had been placed on the other side of the rail, and found that the number had been obliterated and destroyed as it had on the left frame rail. Also, the serial plates from the twin rear axles had been removed; they had been attached in such a way that accidental loss of those plates would be extremely unlikely. The wheel base of the impounded truck was the same as that of the Droke vehicle, 240 inches. And finally, the vehicle specification decal in the cab was a forgery.[18]

plaintiff. The testimony was not repeated within the deposition, was not commented upon by anyone present at the deposition at the time.

Finally, the testimony is contrary to the highly credible testimony of Renauld, Reyburn, and Sunday, and the documentary evidence they have produced. It would be coincidence that somehow the damaged Droke hood were sold for salvage, was repaired, and was incorporated into this rebuilt truck. It would be unbelievable coincidence if, as defendants claim, that hood were by chance to be incorporated onto the same truck as two seats bearing the same VIN.

**14.** The defendants fault the investigators for not tearing apart the engine to determine the exact horsepower and to check the internal VIN. The court notes that, while this additional investigation might have proven useful to the court in reaching a decision, the failure to make this somewhat destructive test is not fatal to plaintiff's claim. Indeed, given the interchangeable nature of this major component, and the likelihood of damage to the engine, it appears reasonable in retrospect not to have done so.

**15.** On February 24, Renauld gave instructions that the truck be taken indoors to warm up, so that an acid restoration test could be performed on the frame. This test showed marks characteristic of the use of an oxyacetylene torch, a process often used in conjunction with hammering of the old VIN to cause the metal to crystalize making the old VIN illegible to this acid restoration procedure. The test did expose a few fragments of the underlying VIN, but those fragments were insufficient to re-create the original number. Nor were those fragments suffi-

cient to rule out the underlying VIN as being 206407, that of the stolen Droke vehicle.

**16.** Renauld later performed additional research based on his observations and photographs made in February 1984. This included checking the records of the engine manufacturer. The flat area on which the number was stamped was uneven and the numerals were not a type that had ever been used by Cummins on its engines—the digit 1 used by Cummins had a cross piece at the foot, while those on the engine in this truck did not.

**17.** *See* footnote 13, *supra.*

**18.** The specification sheet is a document produced by the factory and attached before the truck is sold, listing major components and their serial numbers. The investigators compared the decal to microfiche records of the Freightliner Corporation for the truck bearing the true VIN of 207957. The forged decal bore that VIN, but additionally bore five errors. The model number listed for the truck was a misprint, stating that the truck was model number FLC120646T; the second 6 was superfluous, and would have been meaningless under the Freightliner model numbering system. The engine serial number was not that assigned to the truck with VIN 207957, but had been assigned to a 1979 Peterbilt truck. However, as the identification number on the engine was allegedly a restamp, this information is of limited usefulness. The serial number listed for the clutch is also incorrect. The engine listed is of a different size and brand from that with which 207957 was originally equipped. And the transmission model listed on the decal is different from that which came with 207957.

This decal and the restamped frame rail were the only two places on the truck which bore VIN 207957. There may have been a second decal on the driver's door frame, but it was not on the truck when it was inspected in February 1984.

Following confiscation of the truck, Battle Creek Ford refunded the purchase price paid by Mr. Dorsey Ferguson, and presented Crook Motors with a demand for repayment. Upon request of Crook Motors, Battle Creek Ford produced a copy of the FBI report which stated that the truck was a stolen vehicle. Crook Motors immediately refunded the $54,000 it had received from Battle Creek Ford.

## II. *Conclusions of Law*

### A. Fraud

The nine elements of a claim of fraud are well established in Mississippi. In order to establish fraud, the plaintiff must prove (1) a representation, (2) a falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) its intent that it should be acted upon by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) its consequent and proximate injury. *Franklin v. Lovitt Equip. Co., Inc.*, 420 So.2d 1370, 1373 (Miss.1982); *Gardner v. State*, 235 Miss. 119, 108 So.2d 592, (1959), *quoting* 37 C.J. S. *Fraud* § 3, p. 215. Furthermore, all elements of fraud must be shown by clear and convincing evidence. *Beck Enterprises, Inc. v. Hester*, 512 So.2d 672, 675 (Miss. 1987); *Vogel v. American Warranty Home Service Corp.*, 695 F.2d 877 (5th Cir.1983).

#### 1.

As to defendant Goolsby, plaintiff has failed to show by clear and convincing evidence that defendant Goolsby knew the truck which he sold to Crook Motors to have been a stolen truck. Furthermore, plaintiff has not shown by clear and convincing evidence that defendant Goolsby was not himself honestly and reasonably convinced of the quality of his title. Plaintiffs have thus failed in their proof of the essential fourth element of fraud, that of scienter, in the matter of the stolen truck. *Hamilton v. McGill*, 352 So.2d 825 (Miss. 1977). As to the fraudulent statements which plaintiff *has* proven, as to whether the truck was rebuilt or "whole" [19], whether the truck had been wrecked, and as to the disposition of the truck's engine, there was no proof that such were material in and of themselves, nor was there proof of plaintiff's reliance thereon, nor of its consequent and proximate injury.

Plaintiff further alleges a conspiracy between Goolsby, Simmons, Cregar, and the Jim Cregar Corporation to defraud the public. Again, plaintiff has failed in his proof of this alternate theory of fraud. Plaintiff has produced evidence of various odd circumstances, such as the unreported, unrecorded, cash transaction for the purchase of the truck from Simmons, and the unusual procedure of acquiring title. This evidence, though probative, circumstantial evidence of a conspiracy, *Crowe v. Lucas*, 595 F.2d 985 (5th Cir.1979) (Miss.), is not sufficient in the instant case to carry plaintiff's burden of persuasion. The court is not convinced that defendant Goolsby entered into any agreement, explicit or implicit, to pursue an unlawful purpose or to achieve a lawful purpose by unlawful means. *Shaw v. Burchfield*, 481 So.2d 247 (Miss.1985).

#### 2.

As to the claim by Crook Motors against defendant Simmons, the court finds that plaintiff has proven fraud. Simmons, by fraudulently procuring a certificate of title, altering the truck's VIN, forging a specifications sheet, altering or removing serial numbers on major components, repainting the truck, and replacing parts on the stolen vehicle with parts from other vehicles, made a knowingly false represen-

---

**19.** This was arguably fraudulent, for, though defendant was correct that the truck was not a rebuilt or "kit" truck, at the time, he thought he was lying; an honest, but false answer might have affected plaintiff's purchase of the truck, making it material. Fortunately, this court need not reach that unique question here.

tation to the public regarding his title to the vehicle, intending that the public should consider his title to be valid. He specifically intended that defendant Goolsby should purchase the vehicle from him, and by placing the vehicle thus into the stream of commerce with a presumptively good title, intended that others might subsequently rely upon the truck's apparently valid title for all reasonably foreseeable purposes, including the subsequent purchase of that truck from Goolsby. It is difficult to imagine a misrepresentation as material as that in the instant case. Those whom Simmons has defrauded received nothing but bare possession of the truck, and that only for so long as the fraud went undetected; the innocent purchaser additionally may be subject to liability to subsequent purchasers. This court finds that Crook Motors was ignorant of the falsity of these representations, that it had a right to rely on the apparently valid title, and that it actually relied thereon. As a proximate consequence of its reliance, Crook Motors purchased and resold the truck, and was damaged thereby.

Mississippi's current law of fraud is derived from *Gardner v. State*, 235 Miss. 119, 108 So.2d 592, 594 (1959). *Gardner* cited 37 C.J.S., *Fraud*, § 3, p. 215 as authority for the nine elements it enumerated. Corpus Juris Secundum further speaks to liability under those elements for representations which are not made directly to the claimant.

> [I]t is not essential to liability that there should be privity of contract or personal dealings between defendant and the injured party, and if defendant intended to do an act necessarily resulting in injury to plaintiff he will be held liable, although he lacked a specific intent to deceive the particular person injured.

37 C.J.S., *Fraud*, § 61(a), p. 347–48. Further,

> [w]here misrepresentations are made to the public at large, or to a particular class of persons, with the intention of influencing any member of the public, or of the class, to whom they may be communicated, any one injured through proper reliance thereon may secure redress. In such a case it is not necessary that there should be an intent to defraud any particular person; but the representation must, of course, have been intended for the public, or for a particular class of persons to which complainant belonged.

37 C.J.S., *Fraud*, § 22(2), p. 262.

The court finds no reason to insulate the defendant from liability for the proximate results of his intentionally fraudulent statements on the basis of privity of contract.

3.

■ As to defendants/third party defendants James H. Cregar and James H. Cregar Corporation, plaintiff has failed to prove fraud by clear and convincing evidence. Plaintiff alleges two grounds for this claim of fraud: fraud perpetrated directly by the defendants; and a conspiracy with Simmons and Goolsby regarding the fraud perpetrated by Simmons. Under neither of these theories has plaintiff adduced sufficient evidence of all essential elements to prevail on his claim of fraud against either Jim Cregar and James H. Cregar Corporation. Plaintiff has failed to show, by the requisite clear and convincing evidence, that Cregar made any material false representations regarding the truck [20], and has totally failed to offer evidence regarding Cregar's scienter and intent.

Plaintiff also alleges "conspiracy, collusion, and connivance" and "aiding and abetting" by Cregar and Cregar Corporation in

**20.** Plaintiff has shown that, on the two title applications executed on the 12th day of July, 1983, James Cregar as president of the James Cregar Corporation signed those forms and certified that "the above described vehicle has been physically inspected by me and that the VIN and descriptive data shown on this application are correct and further, I identified the person signing the application and witnessed his signature." *See* exhibits P 43 and P 44. At trial, Mr. Cregar stated positively that, prior to the sale of the truck to Goolsby, he had not seen the truck. He also claims that he never inspected the vehicle or the VIN numbers. Plaintiff has otherwise ignored this admission, and thus no proof of its materiality, or plaintiff's rightful reliance thereon, or proximate injury therefrom was ever adduced at trial, let alone clear and convincing proof thereof.

the fraud perpetrated by Simmons. Plaintiff has offered proof of several unusual circumstances, primary among which is Cregar's gratuitous preparation of title applications, the use of his own bonding authority to allow Simmons to acquire a title certificate for the stolen truck, and the unrecorded, cash-only transactions between Cregar and Simmons for parts which this court has found Simmons did not use to build the truck sold to Goolsby as he had claimed. The court finds, however, that this circumstantial evidence, relevant though it may be, *Wagley v. Colonial Baking Co.*, 208 Miss. 815, 45 So.2d 717 *suggestion of error overruled*, 46 So.2d 925 (Miss.1950), is not sufficient in the instant case to prove an agreement, explicit or implicit, between Simmons and either Cregar, or James H. Cregar Corporation. *See, e.g., Crowe v. Lucas*, 595 F.2d 985 (5th Cir.1979) (Miss.).

B. Breach of Warranty of Title

1.

■ As against defendant Goolsby, plaintiff has proven a breach of the warranty of title under the Uniform Commercial Code (UCC), Mississippi Code Annotated §§ 75–1–101, *et seq.* (1972). Mississippi's warranty of title provision is found at Section 75–2–312, which provides:

(1) subject to sub-section (2) there is in a contract for sale a warranty by the seller that

(a) the title conveyed shall be good, and its transfer rightful; and

(b) the goods shall be delivered free from any security interest or other lien or encumbrance of which the buyer at the time of contracting has no knowledge.

(2) a warranty under sub-section (1) will be excluded or modified only by a specific language or by circumstances which give the buyer reason to know that the person selling does not claim title in himself or that he is purporting to sell only such right or title as he or a third person may have. . . .

Defendant Goolsby did not explicitly nor implicitly exclude or modify the warranty of title on the vehicle sold to Crook Motors,

as would be required under Section 75–2–312(2). He therefore is deemed to have sold the stolen truck to Crook Motors subject to an *ipso facto* warranty of title, under sub-section (1). *See Gunderland Marine Supply, Inc. v. Bray*, 570 S.W.2d 542 (Tex.Civ.App.1978). As it has been proven that Goolsby did not indeed have title to the truck, and that Crook Motors did not know that the truck was stolen, he has breached the warranty of title, and is liable therefor. *See Sarad v. Tatum*, 492 P.2d 882 (Colo.App.1971). Indeed, it appears that it was unnecessary that plaintiff even show the truck was stolen, as long as he could show that the truck had been seized by police as a stolen vehicle. *Id.; John Street Auto Wrecking v. Motors Insurance Corp.*, 56 Misc.2d 232, 288 N.Y. S.2d 281 (1968). Even though Goolsby may have acted innocently in the sale of the truck which turned out to be stolen, he is liable to the buyer for breach of warranty of title. *Ricklefs v. Clemens*, 216 Kan. 128, 531 P.2d 94 (1975).

2.

■ Buddy Simmons is liable to J.W. Goolsby as an indemnitor for whatever damages J.W. Goolsby is required to pay to plaintiff Crook Motors. Simmons, in selling the stolen vehicle to Goolsby, breached the warranty of title he made regarding the truck. Miss.Code Ann. § 75–2–312. He did not exclude or modify the warranty as required by subsection (2). He is therefore liable to defendant Goolsby for the breach. *Sarad v. Tatum*, 492 P.2d 882 (Colo.App.1971).

3.

■ Plaintiff claims that he can reach "all those in the chain of sales who breached the warranty and . . . any and all certifying and posting bond. . . ." Plaintiff's Findings of Fact and Conclusions of Law, at 17. Plaintiff cites no authority for this extension of liability; there is no support in the language of Section 75–2–312(1) for this position. Further, other jurisdictions which have considered this provision have determined that "a seller's warranty of title protects only his immediate purchaser

and does not run with the chattel...." 2 *Anderson on the Uniform Commercial Code*, § 2–312.5; *Universal CIT Credit Corp. v. State Farm Mutual Auto. Ins. Co.*, 493 S.W.2d 385 (Mo.App.1973); *Hertz Corp. v. Hardy*, 197 Pa.Super. 466, 178 A.2d 833 (1962). This court adopts the view taken in those cases, and thereby denies plaintiff's claim for breach of warranty of title against all defendants other than Goolsby.

## C. Negligence

■ Both defendant Goolsby in his third party complaint and plaintiff in its amended complaint, claim that National General Insurance Company was negligent in issuing the title bond without sufficient inspection of the truck. Leaving aside questions of law such as the existence and extent of a duty to inspect, the court rules that neither party has proven a breach of whatever duty exists, nor have they proven proximate causation of their injuries. The only witness who was called to testify as to the actions of National General was Winston Bruce, an independent insurance agent who took Simmons' title bond application and who, at Simmons' request, procured Cregar's authorization to use the title bonding authority of James H. Cregar Corporation to allow Simmons to get title to the stolen truck. Mr. Bruce could only testify as to his own actions, and admitted his own failure to inspect the truck, but had no knowledge of the actions of any other representatives or agents of National General as regarded the truck. Nor was there any proof that, had National General inspected the truck, such inspection would have revealed that the truck was a stolen vehicle; given the facts that Goolsby, Crook Motors, Battle Creek Ford, and Dorsey Ferguson all subsequently inspected the same vehicle from the point of view of a prospective purchaser, and that no one among them discovered that the truck was stolen, the court cannot presume that the lack of yet another inspection by National General, if in fact they did not inspect the truck, proximately caused the losses complained of.

The court finds for defendant/third party defendant National General Insurance Company on the negligence claims brought against it by plaintiff Crook Motors and defendant J.W. Goolsby. In the absence of any defense, the court finds that National General is liable to the extent of $36,000 under the title bond it executed. *See* Exhibit D–9.

### III. Damages

#### 1.

Defendant J.W. Goolsby, having breached the warranty of title on his sale of the 1982 Freightliner tractor, bearing the false VIN 207957 to plaintiff Crook Motors, is liable to plaintiff under Mississippi Code Annotated §§ 75–2–714 and 75–2–715. Section 75–2–714, subsections 2 and 3 provide:

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages under Section 75–2–715 may also be recovered.

■ Plaintiff argues for damages greatly in excess of those ordinarily provided for under this section, but has failed to show "special circumstances show[ing] proximate damages of a different amount." *Compare Ricklefs v. Clemens*, 216 Kan. 128, 531 P.2d 94 (1975) (plaintiff had undisturbed use of automobile for nine months before it was seized as a stolen vehicle; value of automobile at time possession lost—lower than purchase price—was proper damages); *Ford Motor Company v. Fairley*, 398 So.2d 216 (Miss.1981). *McDonald's Chevrolet, Inc. v. Johnson*, 176 Ind.App. 399, 376 N.E.2d 106 (1978) is cited by plaintiff for the proposition that the difference in value of the truck "as warranted" and "time value" was the correct measure of damages, plus "incidental and consequential damages including economic loss due to loss of good will and business reputation." Plaintiff's Findings of Fact and Conclusions of Law. The opinion in

that case speaks for itself more clearly and more accurately, though less expansively, than plaintiff's attorney has done on its behalf. *McDonald's Chevrolet* actually holds only that the measure of damages in the case of the sale of a stolen car is equal to the amount paid for the vehicle, in that case $9,500.00. *Accord De La Hoya v. Slim's Gun Shop*, 80 Cal.App.3d Supp. 6, 146 Cal.Rptr. 68 (1978); *Kruger v. Bibi*, 3 U.C.C.Rptr. 1132 (N.Y.Sup.Ct.1967).

 Plaintiff also claims entitlement to punitive damages against defendant Goolsby for the breach of warranty of title. Punitives may be granted in a proper case in a claim under the U.C.C. *Fedders Corp. v. Boatright*, 493 So.2d 301, 310 (Miss. 1986); *see Beck Enterprises, Inc. v. Hester*, 512 So.2d 672, 675 (Miss.1987) (no election of remedies bar under U.C.C.). The denial of punitive damages is within the discretion of the court. *Id.* at 311–12; *Tideway Oil Program, Inc. v. Serio*, 431 So.2d 454, 461 (Miss.1983). The court finds that in this case plaintiff has failed to prove a "willful and intentional wrong, or ... such gross negligence and reckless negligence as is equivalent to such a wrong." *Seals v. St. Regis Paper Co.*, 236 So.2d 388 (Miss.1970); *see also Bounds v. Watts*, 159 Miss. 307, 131 So. 804 (1931) ("willful and conscious wrong, or actual malice, are conduct so grossly negligent as to amount to a reckless disregard of the rights of the opposite party.") Plaintiff is not entitled to recover exemplary damages from defendant Goolsby.

Section 75–2–715 does entitle plaintiff to incidental and consequential damages from Goolsby. *Ricklefs v. Clemens*, 216 Kan. 128, 531 P.2d 94 (1975); *Massey–Ferguson, Inc. v. Evans*, 406 So.2d 15 (Miss.1981); *Beck Enterprises, Inc. v. Hester*, 512 So.2d at 675.

(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with affecting cover and any other reasonable expense incident to the delay or other breach.

(2) Consequential damages resulting from the seller's breach include

(a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) Injury to person or property proximately resulting from any breach of warranty.

Mississippi Code Annotated § 75–2–715 (1972).

Goolsby knew he was selling to a dealer in used trucks, and so he will be held liable for Crook Motors' reasonable repairs and other expenses of putting the truck into condition for resale, *John Street Auto Wrecking v. Motors Ins. Co.*, 56 Misc.2d 232, 288 N.Y.S.2d 281 (N.Y.D.C.1968), *compare Ricklefs v. Clemens, supra* (plaintiff was not a merchant), and Crook Motors' lost profits on the resale of the vehicle, *Alafoss v. Premium Corp. of America, Inc.*, 448 F.Supp. 95 (Minn.) *aff'd in part and reversed in part on other grounds*, 599 F.2d 232 (8th Cir.1979); *Barney Machinery Co. v. Continental M.D.M., Inc.*, 434 F.Supp. 596 (W.D.Pa.1977). Loss of good will is generally too speculative to be allowed; proof in the instant case was such that, were loss of good will and business reputation allowable, such damages could not be awarded to plaintiff[21].

---

**21.** The only witness on this point, Claude Rogers, Secretary/Treasurer of Crook Motors, testified as to earnings in prior years which were higher than those received in the year subsequent to the seizure of the stolen truck, but admitted on cross examination that that year was a particularly lean year in the industry in general, and also mentioned the company's advertising budget as an additional variable with some vaguely defined effect on the company's anticipated earnings. Overall, his testimony has failed to establish with reasonable certainty any amount of damages due to lost profits resulting from an allegedly diminished business reputation. Even with regards to Battle Creek Ford, to whom they sold the stolen vehicle, plaintiff has failed to prove lost future business. Though Battle Creek Ford has not dealt with Crook Motors since the seizure of the stolen vehicle, neither had they done so prior to that sale, nor

Thus, defendant Goolsby is liable to plaintiff in the following amounts, proven in the instant case:

| | |
|---|---|
| (a) For the purchase price of the stolen vehicle | $48,000.00 |
| (b) For reasonable and foreseeable expenses in preparing the truck for resale | 450.57 |
| (c) Lost profit on the resale of the vehicle | 5,549.43 |
| d) Total | $54,000.00[22] |

**2.**

■ Buddy Simmons, having been found to have defrauded Crook Motors regarding title to the stolen vehicle is liable to plaintiff. Mississippi follows the "benefit of the bargain" rule. *See Davidson v. Rogers,* 431 So.2d 483, 485 (Miss.1983); *Lloyd Ford Co. v. Sharp,* 192 So.2d 398, 400 (Miss.1966); *Hunt v. Sherrill,* 195 Miss. 688, 15 So.2d 426 (1943). The rule states that "[i]n all cases of misrepresentation as to the amount, quality, kind and character of the property purchased, this rule applies, and allows the party defrauded to recover the difference between the real and the represented value of the property." *Sharp,* at 400. Mississippi Code Annotated § 75–2–721 further states that:

Remedies for material misrepresentation or fraud include all remedies available under this chapter for non-fraudulent breach. Neither recision nor a claim for recision of the contract for sale nor rejection nor return of the goods shall bar or be deemed inconsistent with a claim for damages or other remedy.

*See also Beck Enterprises, Inc. v. Hester,* 512 So.2d 672, 675 (Miss.1987). The general aim of fraud remedies is the compensation of the loss to the defrauded purchaser. 37 C.J.S., *Fraud,* § 142(a), at 470–72 and n.

in the months between that sale and the discovery that the truck was a stolen vehicle. Mr. Spitler, President of Battle Creek Ford, testified by deposition and stated that he still had a high professional regard for Crook Motors, strengthened by the prompt, professional manner in which they refunded the purchase price of the vehicle.

74; *InterOcean Oil Co., S.A. v. Ames,* 149 La. 338, 89 So. 205 (1921).

As a general rule, ... it is not at all necessary that the particular damages shall have been contemplated or intended, but it is enough if they are the natural and direct consequence of the fraud; and if they are it will be considered that the party guilty of the fraud ought reasonably to have contemplated them, and they may be recovered whether actually contemplated or not.

37 C.J.S., *Fraud,* § 141(b).

Mississippi's rule gives the defrauded person the "benefit of the bargain" by calculating damages not from the contract price, though that is often used to estimate the value in the absence of other evidence, *Davidson v. Rogers,* 431 So.2d 483, 485 (Miss.1983), but from the value of the goods as represented. *Lloyd Ford Co. v. Sharp,* 192 So.2d 398, 400 (Miss.1966). In the instant case we are presented with evidence of an actual value in excess of the price which Simmons received from Goolsby. In just over ten weeks time, that same truck, involved in three sales, sold for $69,-793 to Dorsey Ferguson. This amount, less the $6,000 spent by Goolsby to "complete" the truck which Simmons had sold him, is the best indication of the value of the truck as it was represented by Simmons. However, as the plaintiff, Crook Motors, sold the truck for $54,000 to Battle Creek Ford, that amount should act as a maximum recovery, reflecting the benefit of the bargain to Crook Motors; any more would be a windfall. *See Caffey v. Alabama Machinery & Supply Co.,* 19 Ala. App. 189, 96 So. 454 (1922), *cert. denied sub nom Ex parte Alabama Machinery & Supply Co.,* 209 Ala. 466, 96 So. 459 (1923); *Senn v. Manchester Bank of St. Louis,* 583 S.W.2d 119 (Mo.1979).

**22.** No proof of the cost for such elements as obtaining a title were produced, but such are included in the above calculation nonetheless, as they would be subtracted as expenses from profit and, if reasonable and foreseeable, added back into the calculation as incidental damages, as have the expenses of preparing the truck for resale, above.

■ Punitive damages are called for under the facts of this case, given the knowing misrepresentations made by Simmons in attempting to pass off the stolen vehicle [23]. Punitive damages are awarded as a punishment to the defendant and as a warning and example to deter him and others from committing like offenses in the future. *West Bros., Inc. v. Barefield*, 239 Miss. 530, 124 So.2d 474 (1960). The amount of such damages shall be a matter within the discretion of the trier of fact, but must not be arbitrary or unreasonable. *Commodore Corp. v. Bailey*, 393 So.2d 467 (Miss.1981); *Planter's Wholesale Grocery v. Kincade*, 210 Miss. 712, 50 So.2d 578 (1951); *Teche Lines, Inc. v. Pope*, 175 Miss. 393, 166 So. 539 (1936). "The amount [of punitive damages] cannot be determined by any fixed rule." *Commodore Corp., supra*. The net worth of the defendant is relevant to the determination of the amount of punitive damages. *Progressive Casualty Ins. Co. v. Keys*, 317 So.2d 396 (Miss.1975). Indeed, punitive damages are meant to punish, but should not be allowed to ruin the defendant. *Miller v. Schnitzer*, 78 Nev. 301, 371 P.2d 824 (1962). However, the financial net worth of defendant Charles D. "Buddy" Simmons is not in evidence in this case.[24] The court, therefore, considering the nature of the offense, and all of the relevant evidence before it, concludes that punitive damages in the amount of $80,000 are proper in the instant case, and shall be awarded against Simmons in favor of plaintiff, Crook Motors.

■ Attorneys' fees are recoverable in the instant case. The standard, in the absence of contractual or statutory liability therefor, is the existence of such a gross or willful wrong as to justify the infliction of punitive damages. *Equity Services Co. v. Hamilton*, 257 So.2d 201, 207 (Miss.1972); *Laurel v. Bush*, 238 Miss. 718, 120 So.2d 149 (1960). The court hereby allows plaintiff twenty (20) days following the entry of this order in which to produce such materials as they may wish in support of its claim for reasonable attorneys' fees, and thereafter allows to defendant Simmons fifteen (15) days in which to respond. Each party should therein address the factors enumerated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), viewed in the light of *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed. 2d 40 (1983); *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); and *Haferty v. Pulse Drug Co., Inc.*, 821 F.2d 261, 271–72 (5th Cir.1987).

### 3.

■ Both Goolsby and Crook Motors have presented valid claims against the title bond,[25] for losses covered under its terms. The bond covers "any expense, loss or damage, including reasonable attorney's fees, by reason of the issuance of the certificate of title...." Under Fed.R. of Civ. P. 14(a), Goolsby has made his application for indemnification against the third party

---

23. Goolsby has failed to plead fraud against Simmons, Fed.R.Civ.P. 9(b) and has not included a prayer for any damages other than those for which he is held liable to Crook Motors. Further, the court cannot find, given the facts of this case and the suspicious circumstances shown at trial (see supra, n. 1), that defendant Goolsby is the sort of claimant to whom the Mississippi Supreme Court referred in *Tideway Oil Programs, Inc. v. Serio*, 431 So.2d 454, 460 n. 1 (Miss.1983), as a "public spirited plaintiff". "A bona fide demand for punitive damages appeals to the conscience of the court. Such damages ought to be awarded only where the plaintiff, at great trouble and personal expense, has rendered a public service by bringing the wrongdoer to account. The plaintiff in such cases is, and necessarily must be, acting as a private attorney general." *Id.* at 461.

24. The only evidence presented as to Simmons' finances is his 1983 income tax return, on which he substantially understated his income, failing to report the income from the sale of the truck involved in the instant action. As defendant is the sole proprietor of a salvage company and a trucking company, this court will not unduly worry about the possibility of defendant's possible—but unalleged and unproven—poor finances.

25. Defendant Cregar, as a state titling agent, may have been required to post a bond; his failure to inspect the truck prior to signing the title application, as he certified he had done, has been admitted. However, neither the existence nor terms of any such bond were proven in this action. *See Western Surety Co. v. State of Miss.*, 330 So.2d 573 (Miss.1976).

defendants, including National General Insurance Company. All of Goolsby's losses, with the possible exception of his reasonable attorney's fees, are derivative from the claims of Crook Motors; he makes a claim for indemnity for any monies for which he actually must pay to Crook Motors. Goolsby has neither pled nor proven any additional damages, and has failed to pay for or prove damages for attorney's fees. His claim is thus subordinate to that of the plaintiff; he has no claim on the bond, nor cognizable damages, until such time as he is adjudged liable to plaintiff. Fed.R.Civ.P. 14(a) allows Goolsby to make his claim for indemnity; Rule 18(b) makes clear that the remedy on a claim which depends upon the prior adjudication of another claim made in the same action shall be granted "only in accordance with the relative substantive rights of the parties." *See generally* 2A *Couch on Insurance 2d* §§ 22.96 *et seq.* (Priorities to statutory deposits), 48:146–149 (automobile dealers bond).

### 4.

### Summary of Remedies

█ Defendants Simmons and Goolsby are jointly and severally liable for plaintiffs' actual damages in the amount of $54,000.00. Defendant Simmons is liable to defendant Goolsby for the amounts, if any, which Goolsby actually pays to the plaintiff. This liability is not to take precedence over Simmons' liability to plaintiff.

Defendant Simmons is liable to plaintiff for punitive damages in the amount of $80,000 and for plaintiff's reasonable attorney's fees, the amount of which shall be determined by the court after the submission of supporting evidence by the parties.

Defendant National General Insurance Company is liable to plaintiff solely on the title bond issued on the stolen vehicle, in the amount of $36,000.00.

The amount of the bond may be applied to plaintiff's actual damages and/or plaintiff's attorney's fees, thus reducing the liability of the defendant(s) thereon. Funds received from defendant Simmons may be applied to that defendant's liability for ac-

tual damages, punitive damages, or attorney's fees, at plaintiff's option.

Accordingly, judgment shall be entered.