WEST BROTHERS, INC. *v.* BAREFIELD, TRUSTEE IN BANKRUPTCY OF CORNETT MOTOR EXPRESS, INC.

No. 41536 November 14, 1960 124 So. 2d 474

*Dudley W. Conner, M. M. Roberts,* Hattiesburg, for appellant.

*Pittman & Pittman, Edward J. Currie, Sr. & Jr.,* Hattiesburg, for appellees.

LEE, J.

Cornett Motor Express, Inc., a corporation, on June 5, 1958, brought its suit in the Circuit Court of Forrest County, against West Brothers, Inc., also a corporation, to recover, in large sums, both actual and punitive damages. The declaration charged that the defendant, on May 1, 1958, wilfully, unlawfully, maliciously, and in total disregard of the plaintiff's rights, entered the premises of the plaintiff, and seized, took away, and appropriated to its exclusive use, six tractors, nine trailers, and other property of the plaintiff.

Thereafter, on June 24, 1958, the defendant, answering in detail, denied all of the material allegations of the declaration, and, by way of counter claim, charged that Cornett Motor Express, Inc., was indebted to it, and sought to recover a substantial sum.

In the meantime, the plaintiff had, on June 21, 1958, filed its voluntary petition in bankruptcy, and, on Sep-

tember 26, 1958, was adjudged to be a bankrupt. The Referee in Bankruptcy, on November 13, 1958, authorized Stone D. Barefield, as trustee, to intervene in the pending suit, and the motion of the trustee to that effect was sustained by the court on November 20, 1958.

The jury, after hearing the evidence and receiving the instructions from the court on the law, returned the following verdict: "We, the jury, find in favor of the plaintiff for actual damages in the sum of $1.00 and for punitive damages in the sum of $20,000.00 and in the total sum of $20,001.00." The plaintiff moved for a new trial on the ground of the inadequacy of the verdict as to actual damages and the defendant moved for a judgment in its favor notwithstanding the verdict of the jury. Both motions were overruled. From the final judgment, West Brothers appealed.

This litigation arose out of the following facts and circumstances: H. L. Cornett, in September 1956, purchased the stock of H. & L. Delivery Service, a motor transportation line, and continued to operate the business in that name for seven or eight months. He assumed the obligation growing out of certain federal tax liens which, at the time, aggregated about $19,000.00. Several months later, the name of the business was changed to Cornett Motor Express, Inc., H. L. Cornett and his wife being the sole stockholders. The shipments consisted of approximately sixty percent interstate and forty percent intrastate. In October 1957, the company admittedly owed about $5,000.00 on C.O.D. shipments, and it was also necessary to purchase privilege licenses during that month.

W. R. Rivers was an experienced truck line operator. He had been successful in previous operations in that kind of business. In August 1948 he began to work for West Brothers. While designated in the minutes of that company as office manager and as assistant to the president, he was actually held out to the general public as a vice-president also. Before Cornett's purchase of H.

& L. Delivery Service, Rivers had negotiated with the then owner J. B. Holloway, to purchase, for a consideration of $25,000.00, fifty-one percent of the stock therein. However, after he saw a financial statement, which reflected an obligation to the Internal Revenue Department, Rivers dropped his negotiations.

In August 1957, Rivers, desiring to get back into business as truck line owner and operator, began talks with H. L. Cornett about purchasing fifty-one percent of the stock in Cornett Motor Express, provided he could effect an interchange of freight with West Brothers. He found Harvey E. West, President, to be interested provided, in such a deal, West Brothers' small tractors and trailers, used for that purpose, would be taken over by Cornett Motor Express.

Documentary evidence to the following effect was introduced:

(1) H. L. Cornett and wife, on October 15, 1957, signed and delivered to W. R. Rivers a contract, which acknowledged the receipt of $500.00, and in which it was agreed that, upon payment of the additional sum of $12,000.00 on or before October 31, 1957, the Cornetts would sell and transfer to Rivers fifty-one percent of the stock of their company;

(2) Under date of October 29, 1957, a conditional sales contract was executed in which West Brothers, Inc., agreed to sell and W. R. Rivers agreed to purchase six tractors and nine trailers, as described therein, for the sum of $27,000.00, payable on demand. Title was not to pass until the full purchase price had been paid;

(3) Under date of October 28, 1957, Cornett Motor Express, Inc., by H. L. Cornett, Sr., as president, executed to Citizens Bank of Hattiesburg a note in the sum of $18,450.00, payable at the rate of $1,025.00 on December 5, 1957, and a like amount monthly thereafter until fully paid. There was a notation thereon that six tractors and nine trailers would stand as security. The note was endorsed by both H. L. Cornett, Sr., and

W. R. Rivers. Under date of October 29, 1957, a chattel deed of trust was executed by Cornett Motor Express, Inc., by H. L. Cornett, Sr., to secure the payment of the foregoing mentioned note; and the six tractors and nine trailers, as described in the contract of sale and purchase from West Brothers to W. R. Rivers were listed as security. (This note and deed of trust, on May 12, 1958, were transferred by the bank without recourse to W. R. Rivers for a stated value of $13,325.00);

(4) Under date of November 1, 1957, Cornett Motor Express, Inc., by H. L. Cornett, Sr., President, executed to West Brothers a note and deed of trust to secure the payment of $9,500.00, due November 1, 1958. The deed of trust listed the same fifteen motor vehicles, as heretofore described, as security;

(5) As a result of the loan from the Citizens Bank of Hattiesburg, Cornett Motor Express, Inc., was given credit for the $17,500.00 thus obtained. The company, by H. L. Cornett as president, then issued a check in the amount of $17,500.00 to West Brothers, Inc. This amount was credited to the account of West Brothers after being endorsed "West Bros. by W. R. Rivers";

(6) W. R. Rivers issued a check, dated October 31, 1957, drawn on the account of W. R. Rivers Special, payable to H. L. and Mrs. H. L. Cornett, in the sum of $10,500.00, which had a notation thereon concerning a check of date of "10/30/57" for $1,500.00. (The combination of these two items, with the original payment of $500.00 on October 15, 1957, amounted to $12,500.00, and was sufficient to constitute full payment by him for fifty-one percent of the stock of Cornett Motor Express, Inc., as previously agreed upon);

(7) W. R. Rivers, out of his designated special account, on October 31, 1957, issued a check to Cornett Motor Express in the sum of $5,000.00 to pay for privilege licenses due that month, and again, on November 29, 1957, another check in the amount of $5,000.00, to pay for C.O.D. shipments which were then past due.

Thus it is seen that Rivers paid to the Cornetts the full price of $12,500 for fifty-one percent of their stock, and made the company two loans of $5,000.00 each. His total outlay therefore was $22,500.00. Although he asked Cornett several times to issue the stock, he was never able to get this done. Cornett's attorney finally advised that the stock could not be issued inasmuch as it was hypothecated to J. B. Holloway, the former owner, because it had not been fully paid for. This was at variance with the previous representation of Cornett that the stock was clear and available for delivery.

Harvey West testified that even though it might appear, according to the record, that West Brothers received $17,500.00 as payment on the equipment, the truth of the matter was that the company in fact received nothing; and W. R. Rivers also testified that this was true.

The interchange of freight between Cornett Motor Express and West Brothers commenced on November 4, 1957. As time passed, Cornett became indebted to West and delinquent on settlements. Complaints to West were made by its customers on interchange traffic, on C.O.D. delinquencies, and because of unpaid claims. Besides, it was necessary, from time to time, for West to extend its credit in order that Cornett might continue operations. In addition the equipment of Cornett became damaged, and deteriorated into a bad state of repair. After several months in an unsatisfactory experience, West decided to dispense with the interchange agreement and go back to handling its own local runs. Following this decision, West demanded of Rivers payment for the tractors and trailers, which he had placed in the hands of Cornett Motor Express, or the return of such equipment. In consonance with that demand, Rivers, who claimed that he was acting for himself and not for West in all of these transactions, called on R. W. Robertson, in charge of the office of Cornett Motor Express, to deliver this equipment to him. The delivery was ef-

fected during the evening of May 1, 1958, and will be treated in more detail hereafter.

Although Robertson, over a period of years, had worked for West Brothers in different capacities, it appeared that, at different times, he had taken several leaves of absences. He testified that, while he was working for West Brothers in Hattiesburg as dock operator because of the illness of one of the regular employees, Cornett observed his work, appeared to be pleased with it, and asked ''would I consider going to work for him and help put Cornett Motor Express back on its feet?'' Being agreeable thereto, he went to work for Cornett Motor Express ''around the middle of February'' of 1958 as Cornett's assistant. It is undisputed that he was paid on a weekly basis. He, of course, became fully apprised of the desperate financial condition of the company. They were notified, on the morning of May 1, 1958, that West Brothers was beginning to rework their locals that day. For about three hours that afternoon, he discussed this change with H. L. Cornett, who made the statement to him that ''if West Brothers wanted us to return their freight so they could begin operating their locals, he would help me load and return it to West Brothers * * *''. The witness knew that, with the loss of the West Brothers traffic, Cornett Motor Express could not operate, but Cornett seemed to be unconcerned. When, between 8:00 and 9:00 o'clock on the evening of May 1, 1958, Rivers called over the telephone and asked that he return the tractors and trailers that had belonged to West Brothers, Robertson promised to do so; and he did in fact, after unloading and emptying the freight, deliver the equipment to Rivers in accordance with his promise so to do. The plaintiff put Robertson on the stand as its witness, and vouched for his veracity and credibility. While Cornett admitted that Robertson worked at his place of business and did not deny that the plaintiff paid him, he said that Robertson was not in fact his employee, that he and Harvey West had a controversy

about Robertson, and that, although he tried to fire him, he could not do so. Besides, he said that he did not authorize anyone to deliver the equipment to Rivers or West Brothers.

Cornett was testifying about a conference that he had with West, D. Conner, Rivers, and others on May 27. He was asked if he had not testified that the equipment had been taken from him on May 1, 1958, and his reply was: "Yes, sir, it was just a few days after that." He was relating that, in this conference, they were trying to get him to sign the chattel mortgage to W. R. Rivers, and they were upset because he would not sign; and that Mr. West said "all right, they would break me, and I'd wish I had of signed it". Then his counsel asked: "If I understand you, Mr. Cornett, what you say is the conference was about two days before the equipment was actually taken?", and his reply was: "That's right". When the judge asked him to clarify his answers, he said it was on April 27, 1958.

Cornett, by registered letter of date of May 2, 1958, to H. E. West, President, demanded the return of the property taken. The motor vehicles were not returned, but an air conditioner was.

Actually the financial statement of Cornett Motor Express for the eleven month period ending November 30, 1957, for the calendar year ending December 31, 1958, for the month of January 1958, for the two month period ending February 28, 1958, and for the three month period ending March 31, 1958, showed the operating ratio of the company to be 109.15, 108.56 100.92, 108.92 and 108.80, respectively. In other words, the company put out more dollars than it took in, and obviously lost money each month of its operation.

West Brothers, on its counter claim, offered evidence which tended to show that Cornett Motor Express was indebted to it in a substantial sum of money on account of advances and credits in connection with the operation of Cornett's business.

 █ Appellant contends that the trustee in bankruptcy has no interest in the outcome of this litigation, and that he had no right to intervene or continue the prosecution of this cause.

Section 110(a), Title 11, U.S.C.A., provides in part as follows: ''The trustee of the estate of a bankrupt and his successor or successors, if any, upon his or their appointment and qualification, shall in turn be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition initiating a proceeding under this title, except insofar as it is to property which is held to be exempt, to all of the following kinds of property wherever located * * * (6) *rights of action arising upon* contracts, or usury, or *the unlawful taking or detention of or injury to his property* * * *.'' (Emphasis supplied.) See also 8 C.J.S., Bankruptcy, Section 194, pp. 655-6, where it is said, that, under the above provisions of the bankruptcy act, the authority of the trustee ''includes a right of action for a tort affecting the property of the bankrupt, such as fraud and conversion, * * *''. This is not to be confused with a purely personal tort action. In the C.J.S. text, supra, it is said that this authority of the trustee does not apply to ''a right of action for a purely personal tort''. This latter principle is in conformity with the holding of this Court in Dent v. Town of Mendenhall, 139 Miss. 271, 104 So. 82, where it is held that the personal tort of John Dent against the Town for the death of his wife did not pass to the trustee in bankruptcy even though Dent was a bankrupt at the time of the filing of the suit.

It is clear therefore that the trustee had the right to continue this action.

The appellant also contends that it was not liable for either actual or punitive damages, but should have been permitted to recover, on its counter claim, for the full amount of the demand.

 █ The note of Cornett Motor Express, Inc., to West Brothers, secured by the chattel mortgage herein-

above mentioned, was not due until November 1, 1958. Neither was there any claim at the time that the property was taken because of any other default in the provisions of that instrument. W. R. Rivers held no paper which entitled him to possession of the property in question. He did not acquire the note and deed of trust heretofore mentioned from the Citizens Bank of Hattiesburg until May 12, 1958. Besides, the payments, which were provided for in that note, had been made when and as they became due.

The appellant had no legal right to the possession of the property at the time it detained the same. Such detention obviously resulted in some actual damage by reason of the interruption in the course of the appellee's business. Robinson & Pattison v. Goings, 63 Miss. 500.

██ █ The appellant made no motion for a new trial and cannot validly claim that there was no evidence to support the jury's finding. The evidence showed that it was impossible to operate the business without the motor vehicles in question. Cornett testified that no one had authority to turn the property over to West Brothers or to Rivers. Thus the issue as to actual damages was properly one for submission to the jury. Whether it in fact found that the plaintiff had sustained substantial actual damages and allowed a recoupment on the counter claim of West Brothers so as to result in a balance of $1.00 in favor of Cornett Motor Express, Inc., as it may have done, no one can say. Neither can one say that a verdict in that amount was not attributable to the desperate financial condition of the appellee. In other words, if it was already losing money anyway, there was little, if any, opportunity to earn any profit, which it could lose. Hence, actual damages, if any, necessarily would be very small. The jury was properly instructed as to the form of its verdict; and there is no sound basis upon which it can be said that the verdict does not represent the actual finding of the jury.

As heretofore stated, Rivers, in the minutes of the company, was designated as office manager and assistant to the president. But, by advertisements and otherwise he had been held out by the company as a vice-president. He testified that, in all of his transactions with the Cornetts, he was acting in his individual capacity. So far as the documentary evidence is concerned, the contract showed him to be the proposed purchaser of fifty-one percent of the Cornett Motor Express stock. The proof is clear that the $18,450.00 loan mentioned above, was obtained on his endorsement. It is without dispute that Rivers actually paid $12,500.00 for the stock, as he had agreed to do, and that the Cornetts would not or did not execute the stock, as they had agreed to do. In addition Rivers let Cornett have $5,000.00 to pay up delinquent C.O.D. shipments and $5,000.00 to purchase privilege licenses. The Cornetts, as the saying goes, really "took him for a cleaning". There was every reason to believe that the financial situation of Cornett Motor Express was hopeless. The perfectly natural thing for Rivers to do, under the circumstances, was to hedge against his impending loss by obtaining such property of the company as he might be permitted to receive.

On the other hand, if Rivers was in fact acting for West Brothers, his situation, if anything, was more delicate and precarious because his employer could validly attribute its loss to his naivete and poor business judgment. So Rivers informed R. W. Robertson that West Brothers was discontinuing its exchange of freight and was demanding either payment for the equipment or its return. Robertson, in turn, discussed the matter fully with Cornett, who appeared to be unconcerned.

No employee of West Brothers went upon appellee's premises. Neither did Rivers do so. Besides, he committed no trespass, and was guilty of no oppressive conduct. He asked, over the telephone, the return of the quipment, in which, if the Cornetts had lived up to their agreement, he would have had a fifty-one per-

cent ownership. Ostensibly Robertson was the employee and agent of Cornett Motor Express. He it was who delivered the equipment to Rivers. H. L. Cornett's testimony to the effect that Robertson was not the employee of Cornett Motor Express, under the evidence in this case was incredible. In such circumstances, punitive damages were not allowable.

 ██ Exemplary or punitive damages are allowed and awarded ''as a punishment to the defendant and as a warning and example to deter him and others from committing like offenses in the future''. 15 Am. Jur., Damages, Section 266, p. 700. ██ See also 25 C. J. S. Damages, Section 117, pp. 705-7; and Section 119, pp. 715-6, as follows: ''In order that there may be a recovery of exemplary damages, there must in general be present in the circumstances some element of malice, fraud, or gross negligence, * * *. In other words, the wrongs to which exemplary damages are applicable are those which besides violating a right, and inflicting actual damages, import insult, fraud, or oppression, and are not merely injuries, but injuries inflicted in a spirit of wanton disregard of the rights of others.'' See also D. L. Fair Lumber Co. v. Weems, 196 Miss. 201, 16 So. 2d 770; Milner Hotels v. Brent, 207 Miss. 892, 43 So. 2d 654.

Consequently the court should have given the appellant's requested instruction that the jury could not return a verdict for punitive damages.

The judgment of the trial court in the amount of $1.00 with respect to actual damages, is affirmed and judgment of $20,000.00 for punitive damages is reversed, and a judgment will be entered here for the appellant in that phase of the case.

Affirmed in part, and in part reversed and rendered for the appellant.

*Hall, P. J.,* and *Holmes, Ethridge* and *McElroy, JJ.,* concur.