794 So.2d 237 (2001)
Moti L. SUDEEN, Appellant,
v.
Richard CASTLEBERRY and Alma Castleberry d/b/a Castleberry Realty, Appellees.
No. 1999-CA-01241-COA.
Court of Appeals of Mississippi.
February 20, 2001.
Rehearing Denied May 15, 2001.
Certiorari Denied September 6, 2001.
*239 Thomas M. Matthews Jr., Wiggins, Attorney for Appellant.
Lawrence Cary Gunn Jr., Hattiesburg, Attorney for Appellees.
Before McMILLIN, C.J., PAYNE, and LEE, JJ.
*240 LEE, J., for the Court:
¶ 1. The Pearl River County Chancery Court found that the plaintiffs, Richard and Alma Castleberry, d/b/a Castleberry Realty, were the procuring cause for the sale of certain realty from former Louisiana Governor Edwin W. Edwards (hereinafter "Governor Edwards" or "governor") to Moti L. Sudeen, and awarded $48,000 to them in real estate commission plus interest and an additional $100,000 for punitive damages and attorney's fees. Sudeen asserts that the Castleberrys were not the procuring cause of the sale of the property he purchased from Governor Edwards because the contract to purchase procured by the Castleberrys had expired when the final agreement upon which the sale was consummated was reached. Sudeen claims that the final agreement was a "new deal" to which the Castleberrys had no part. Sudeen, the appellant, contends that there is not substantial, credible evidence in the record to support the chancellor's findings of fact on each of the six issues which he asserts as error. Our review of the proceedings yields the firm and definite conviction that the decision below was consistent with established law and well within the evidence. We therefore affirm the judgment of the Pearl River County Chancery Court.
¶ 2. At this point an examination of the facts, including an overview of the cast of characters and their respective functions, though somewhat lengthy, is appropriate so that this information can be applied to the legal aspects of the this issue.

FACTS
¶ 3. Sudeen was born and educated in Guyana and had moved to the United States in 1974. He became a U.S. citizen in 1982 and had lived in Chalmette, Louisiana with his family for over twenty years at the time of trial. Sudeen wore several hats. He is a pharmacist as well as the pastor of several Baptist churches. He hosted a radio program called "Christ is the Answer" from 1976 until 1996. He had incorporated his business in Louisiana as Sudeen Enterprises in 1981. At the time of trial he owned a pharmaceutical company in Guyana, and he traveled to Guyana once a month.
¶ 4. Sudeen had formed a partnership called Mississippi Carbonate in April 1996 with Everett and June Lawrence for the purpose of building a fertilizer plant for the manufacture of urea in Pearl River County. The Lawrences had a 25% interest and Sudeen a 50% interest in Mississippi Carbonate. It is unclear who had the remaining interest. Nevertheless, there was no evidence presented to indicate that Mississippi Carbonate had any assets. Everett Lawrence ultimately admitted, on cross-examination, that he had invested money in Mississippi Carbonate and that all he had to show for his investment was ownership in a company with no assets. The Lawrences had the responsibility to locate property for purchase upon which the plant would be built while Sudeen was to secure the necessary financial support for the project. Most of Sudeen's efforts to secure financing were being made in London where he traveled every week, spending four days a week there and three days in Louisiana. The fertilizer plant project required financing in the amount of 4.5 billion (with a "b") dollars, and Sudeen testified that at the time of the trial one-third of that amount had already been financed. The plant would employ 465 people. Sudeen testified that he intentionally stayed in the background during negotiations for the purchase of property because in the past, sellers had increased the asking price for property once it was brought to their attention that he was involved in the purchase.
*241 ¶ 5. The Lawrences pursued their quest for property. Ultimately, two separate purchases were made in acquiring the property needed for the project. This appeal is in regard to the second purchase; however, we will review the testimony regarding the first purchase as well, for it provides insight on the issue presented before us regarding the second purchase.

Purchase of the First Tract
¶ 6. Castleberry and his wife had been in the real estate business in the Poplarville area of Pearl River County since 1987. He served as a director of the Pearl River County Development Association and had a special interest in new industries coming into the county. According to Mr. Castleberry, he first heard about the search for property for this fertilizer plant from a telephone call he received from Everett Lawrence. Everett described the property he needed as several hundred acres with a railroad and a gas line running through it. Castleberry said that he told Everett that he knew of some property fitting that description but that he did not know who the current owner was. Castleberry's property owner's map showed that the property was owned by a large company, and he knew from personal knowledge that that company had sold the property and the owner's map had yet to be updated. Castleberry told Everett that he would find out who the current owner was. Castleberry testified that he went to the courthouse and found out that the owner was Lampton Williams. Castleberry called Williams who told him that coincidentally the property was for sale and was already listed with another realtor. Williams told Castleberry that he would be glad to meet with the prospective buyers himself; however, he would not be able to meet with them on that day, which Castleberry says was Friday, but he could meet with them on Monday. Castleberry gave this information to Lawrence. Instead of waiting until Monday, the Lawrences went to Williams's office that day and waited until he would see them. Castleberry said that the Lawrences must not have realized that the property was listed until they met with Williams since there was no "for sale" sign on the property. A contract for purchase was signed that day. Castleberry said that Everett later showed the contract to him and that the purchase price was $500,000 plus a six percent real estate commission. Castleberry said that after this contract was signed he talked with Everett almost daily because Everett was so enthused about the project. He also said that once the sale of that property closed, though he did not receive a real estate commission for the sale, that Lampton Williams sent a check to him for $5,000 as a finder's fee. Williams told Castleberry that he thought he was entitled to the finder's fee because he had found the buyers.
¶ 7. The testimony of June and Everett Lawrence tells this story differently. Both testified that Castleberry had nothing to do with any part of the sale of the Williams property. Everett testified that when the decision was made to build the fertilizer plant, that he hired someone to fly him over the gas pipeline from Hattiesburg following the Pearl River to the Lucedale area in search of a 600 acre site that would be suitable for the project. Everett said he and his wife then went to the courthouse and looked up the maps themselves and determined on their own that Williams was the owner of the property which he sought. Everett testified that he had already spoken with Williams regarding the property before ever having discussed it with Castleberry. Everett was discredited, however, on cross-examination, when he acknowledged that a notation made in his telephone log on April 8,1996 revealed he had met Castleberry at *242 the courthouse to search the records for the papers on section 17 and that that was in regard to the Lampton Williams property.

Negotiations for the Purchase of the Second Tract
¶ 8. Though the actual plant was to be built on the Williams tract, a second tract was needed with appropriate facilities to serve as temporary office quarters while the plant was under construction, to provide a site for a proposed lake to be utilized by the plant as a water source, and to serve as a buffer zone. Therefore, shortly after arrangements were made for the purchase of the Williams tract, a search for a second tract of land was pursued. The Edwards property was ultimately purchased as a result, and it is that purchase which is the basis of this appeal. Though it is undisputed that Castleberry procured the initial contract for the sale of the Edwards property, Sudeen argues that the final sale was the result of a new deal and that Castleberry was no part of it. A review of the initial contract and its related extensions is necessary in order to provide an understanding of its relationship to the final agreement which resulted in the sale of the property.
¶ 9. During mid-April, just a matter of days after arrangements were made for the purchase of the Williams property, Everett Lawrence contacted Castleberry in search of the second parcel of land. The Castleberrys took the Lawrences for a ride in their car to view potential cites, and Everett inquired if the tract adjacent to the Williams tract, which Castleberry knew belonged to Governor Edwards, was for sale. There was no sign posted on the property but Castleberry told Everett that he was familiar with the property because he had handled the inventory of the property after the death of the prior owner, Mr. Bill Watson. Castleberry told Everett that he had a map of the property as well as its valuation and the inventory of equipment in his filing cabinet. Castleberry's initial efforts to contact the governor, who had an unlisted number, were unsuccessful and he finally contacted the widow of the prior owner, Mrs. Watson. She called her son, Steven, who was a friend of the governor's son. Castleberry obtained Steven's number through Mrs. Watson and first contacted him on April 18, 1996. Steven told him the property was not for sale but his father would sell anything if the price was right. Steven told Castleberry that his father was at his condominium in Aspen and that he would call him to see if he was interested in selling the property. Steven called Castleberry back and told him his father was interested in selling and that he would be home in a few days. Steven gave Castleberry the governor's number, and Castleberry called him when he returned. The governor told him that the property was not on the market but he would sell the property for one million dollars. Castleberry testified that the governor, being experienced in real estate, told him on the front end that he had no agent, that Castleberry was not his agent, and that Castleberry was working for the buyer. This is corroborated in the governor's deposition, where he stated in regard to his conversation with Castleberry, "I was very explicit that I would not be responsible for any real estate fees or commissions." The governor went on to say that Castleberry told him he understood that.
¶ 10. Castleberry showed the property to the Lawrences. The property included a main house, a guest house, two apartment buildings, a large equipment shop on two levels. Castleberry also made arrangements with the property manager, Ricky Wells, to unlock the gate on a Sunday afternoon so that Sudeen could tour *243 the property. Castleberry testified that he gave Wells a check for $25 payment for his services that day and entered that cancelled check into evidence. At some point in time the Castleberrys took an inventory of the property along with the Lawrences and the governor's daughter.
¶ 11. After negotiating and three counter-offers, an agreement was reached and the initial contract for the purchase of the Edwards property was signed on May 24, 1996 for a purchase price of one million dollars. That agreement required that Sudeen deposit $50,000 earnest money, which would be applied to the purchase price at closing, into Castleberry's brokerage account, by June 10, 1996. Closing was to take place on or before July 31, 1996. The offer included all the furnishings in the main and guest houses and outside kitchen, except for personal items and artwork and a few pieces of furniture specifically excluded. Also included was all of the operating and maintenance equipment. This agreement stated that the buyer would pay Castleberry Realty a 6% commission. The Lawrences secured a loan on their own behalf for the $50,000 in earnest money. Castleberry testified that this deposit was delivered to him just three hours prior to the bank's closing on June 10, the deadline date. Castleberry called the governor to tell him that the deadline had been met for the deposit. However, Sudeen was not able to meet the July 31 deadline for closing and sought an extension.
¶ 12. The governor wanted $25,000 of the deposit in the form of a certified check to grant an extension to August 15. This amount would be applied to the purchase price at closing. On July 26 Castleberry called Sudeen for his authorization to release the $25,000 from his account for the extension. Sudeen faxed authorization to Castleberry. Castleberry purchased a certified check and hand-delivered the check to the governor and the governor wrote his initials on a letter Castleberry had written to Sudeen explaining what had occurred. The August 15 deadline was extended to August 31. That deadline was not met either. On September 4, Sudeen and the governor agreed that Sudeen would bring an additional $25,000 to the governor by 5:00 p.m. the next day and the deadline would be extended to November 1. This agreement required that Sudeen pay $250,000 at closing and the governor would finance the remainder of $700,000. Furniture was now excluded from the sale. Castleberry was not involved in negotiating this extension but the agreement for this extension was written by the governor on the second page of the original contract by Castleberry Realty. Sudeen called Castleberry after this extension was agreed upon to release the additional $25,000 required by the governor as a nonrefundable deposit. Under the original contract, the $50,000 deposit would have been divided between the seller and realtor in case of default. Castleberry insisted that Sudeen sign a promissory note for $25,000 in case of default in order to release the $25,000. Castleberry made the check out and gave it to June Lawrence just before the 5:00 P.M. deadline on September 5. June Lawrence gave the check to the governor.
¶ 13. As November 1 approached, June Lawrence asked Mrs. Castleberry to obtain an estimate of the monthly expenses necessary for the maintenance of the property. These expenses were listed and entered into evidence as an exhibit. At some time before the deadline Mrs. Lawrence told Castleberry that there would be no closing on November 1 and that an arrangement had been made where Sudeen would take possession of the property and the responsibility of paying maintenance expenses, utilities, and the salary for the *244 property manager until he was able to purchase the property. The governor left his cattle and horses on the property and they were cared for at Sudeen's expense.
¶ 14. The governor stated in his deposition that after November 1 he granted several extensions in his negotiations with Sudeen and the Lawrences; however, there was not any written agreement after that time. Pursuant to the gentlemen's agreement between him and Sudeen, the governor agreed that he would sell the property to Sudeen in the next few months if Sudeen could arrange for payment. He said that in exchange for the extensions he excluded property that had been included in the original agreement. He stated, "I was reducing the scope of the property to be sold as consideration for giving the extensions." The governor said he did not believe he could get one million dollars for the property once the furnishings and equipment were excluded. He said it was a relief to him that Sudeen was paying the property expenses; however, because he did not believe that a sale would ever be consummated after so many extensions, he listed the property with Ford Realty in February, 1997, excluding Sudeen as a buyer.

The Purchase of the Second Tract
¶ 15. Ford Realty located a buyer in August, 1997 who made an offer of $800,000 cash for the property, excluding furnishings and equipment. Edwards said he gave Sudeen the opportunity to meet this price because it was less than the agreement he already had with him, he had given his word to him, and he already had $50,000 of his money. Because of his prior experience with Sudeen, the governor required that Sudeen make a $100,000 down payment within 24 hours. Sudeen met the deadline for the down payment and an agreement was signed on August 11 that the governor would finance the $700,000 balance, just as the governor had agreed to do when the contract had been extended to allow for the November 1, 1996 deadline. This agreement stated that a 6% commission was to be paid to the realtor by the buyer.
¶ 16. The closing for the property was scheduled for August 18. Mr. Castleberry happened to hear from an outside source that the closing date for the sale had been scheduled and contacted Lawrence for the details. Lawrence told Castleberry that he did not know when closing was scheduled and that he could call Gerald Cruthird, the attorney Sudeen had selected to handle the closing, for that information. Castleberry then testified that Lawrence said, "I might as well go ahead and tell you, we have changed the amount of the contract, but you are going to get your six percent commission on eight hundred thousand dollars."
¶ 17. On August 18 all the parties appeared at Cruthird's office for the closing. Sudeen claims he was surprised to see Castleberry there. Actually, Sudeen came to the closing with no money to pay the realtor's commission or the attorney's fees. Cruthird and Castleberry both testified that Sudeen stated that he could not pay those fees on that date but that Sudeen explicitly stated at the closing that he would pay the realtor's commission within two weeks. At the closing Sudeen signed a closing statement which specifically stated that Sudeen would pay a $48,000 realtor's fee to Castleberry Realty. This closing statement is the third document Sudeen signed acknowledging his liability for Castleberry's commission. Sudeen testified at the trial that he signed this document under protest because he was faced with losing his $100,000 deposit. He said that he did not believe he owed Castleberry a fee because the agreement at closing was a "new deal" since the *245 terms had changed from the last written extension for November 1, 1996 of the original contract where Sudeen had agreed to pay a realtor's fee.
¶ 18. Sudeen paid the attorney's fees but refused to pay Castleberry. He claims that he had obtained an opinion regarding his obligation to pay the realtor's fee from the Mississippi Real Estate Commission and that according to that opinion he did not owe a fee.

STANDARD OF REVIEW
¶ 19. The applicable standard of review will not permit that the finding of the trier of fact be disturbed on appeal if there is substantial supporting evidence even if under the same proof we might have found otherwise. The finding of fact may not be set aside unless manifestly wrong. Dungan v. Dick Moore, Inc., 463 So.2d 1094, 1100 (Miss.1985); Cotton v. McConnell, 435 So.2d 683, 685 (Miss.1983). "Findings of fact made by a chancellor which are supported by credible evidence, may not be set aside on appeal." Allgood v. Allgood, 473 So.2d 416, 421 (Miss.1985). In evaluating the issues before us in this case, the standard of review to which we are bound does not permit us as an appellate court to disturb the factual findings of a chancellor, when they are supported by substantial credible evidence, unless the Court can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard. Cummings v. Benderman, 681 So.2d 97, 100 (Miss.1996). Therefore, if there is supporting evidence and "even if this Court disagreed with the lower court on the finding of fact and might have arrived at a different conclusion, we are still bound by the chancellor's findings unless manifestly wrong." Richardson v. Riley, 355 So.2d 667, 668 (Miss.1978).

ISSUES AND DISCUSSION

I. DID THE COURT ERR IN FINDING THAT CASTLEBERRY REALTY WAS THE PROCURING CAUSE OF THE SALE OF THE PROPERTY FROM EDWIN EDWARDS TO MOTI SUDEEN?
¶ 20. The preponderance of the evidence is the common law standard of review for contract breaches involving an intentional wrong. Paracelsus Health Care Corp. v. Willard, 754 So.2d 437, 447-48 (¶ 53) (Miss.1999). The plaintiff has the burden to prove by a preponderance of the evidence the existence of a binding contract, that the defendant breached the contract, and that the plaintiff has suffered monetary damages as a result. Warwick v. Matheney, 603 So.2d 330, 336 (Miss.1992)(citing 17A C.J.S. Contracts, § 590(d) at 1148); Garner v. Hickman, 733 So.2d 191, 195 (¶ 15) (Miss.1999).
¶ 21. In general terms, precedent established by case law in this state entitles a real estate agent to recover a commission on a sale if the agent was the procuring cause of the sale of the subject property. Partee v. Pepple, 197 Miss. 486, 493, 20 So.2d 73, 74 (1944). Whether a broker may be considered the procuring cause of a sale depends upon the particular facts and circumstances of each case, and this is ordinarily a question of fact to be resolved by the trier of fact. 12 Am. Jur.2d Brokers §§ 189, 190 (1964); Smith v. London, Stetelman & Kirkwood, Inc., 185 So.2d 150, 154 (Miss.1966). The broker's efforts need not be the sole cause of the sale, but must be the predominant cause. Id.
¶ 22. Sudeen concedes that Castleberry was the procuring cause of the initial contract but claims that his involvement ended on November 1, 1996 and that *246 the agreement which culminated in the sale was a "new deal." Sudeen testified that he was able to negotiate more favorable terms for the purchase himself than Castleberry had negotiated prior to the expiration of the November 1, 1996 extension. The question thus becomes whether the agreement for the sale of land which expired on November 1 was abandoned and whether the agreement which culminated in the sale was an entirely new one. Precedent has clearly established that the major factors in determining if an agreement for the sale of land has been abandoned is whether parties had abandoned all expectations of culminating the sale and whether the negotiations which led up to the sale began anew. Swain v. Pitts, 120 Miss. 578, 594, 82 So. 305, 306, (1919).
¶ 23. Looking at the facts, we cannot say that either the governor or Sudeen had abandoned expectations of the sale being culminated. Sudeen clearly testified that he intended to finalize the purchase if he could secure financing. In addition, the arrangement agreed upon whereby Sudeen took possession of the property and the responsibility of paying maintenance expenses, utilities, and the salary for the property manager was made in anticipation of his ultimately purchasing the property. Though the governor stated that he finally listed the property with another realtor because he did not believe that Sudeen would ever come up with the money, he clearly had not abandoned the possibility that Sudeen may come through with the financing as is evident by the fact that his contract with Ford Realty excluded Sudeen as a buyer.
¶ 24. Neither are we persuaded that the negotiations which led up to the sale began anew. Negotiations were considered to have begun anew after the sale had been clearly abandoned by the broker and the purchaser in Swain v. Pitts because an entirely new and independent element entered into the trade for which the broker was in no sense responsible, which consummated the sale. Swain v. Pitts, 120 Miss. at 594, 82 So. 305 at 306. The party who finally brought the buyer and the seller together in that case was not connected with the realtor, and it was through the negotiations and efforts of this party that a final sale was made for a different lot than had been previously considered for purchase. The court noted that the record did not indicate that the final agreement between the buyer and the seller was made for the purpose or with the object of defeating the broker of a commission, but that the negotiations instituted by Pitts & Weeks, the broker, ended in a failure to make a sale, and that the subsequent agreement was made without reference to the activities of Pitts & Weeks. Id.
¶ 25. We cannot say that the final agreement between Sudeen and the governor was made without reference to the activities of Castleberry Realty. The governor clearly stated in his deposition that the reason he gave Sudeen the opportunity to purchase the property when another buyer was found was because he had given his word to him and he already had $50,000 of his money. This was clearly a result of Castleberry's efforts. There was no new element involved in the final agreement as there was in Swain v. Pitts, and negotiations were not begun anew. The general proposition is established that if property is placed in the hands of a broker for sale at a certain price, and a sale is brought about through the broker as the procuring cause, he is entitled to commissions on the sale even though the final negotiations were conducted through the owner, who, in order to make a sale, accepts a price less than that stipulated to the broker. Partee v. Pepple, 197 Miss. *247 486, 493, 20 So.2d 73, 74 (1944); Case v. Harrison, 192 Miss. 531, 6 So.2d 582, 587, (1942); Roell v. Offutt, 138 Miss. 599, 103 So. 239, 239, (1925). We therefore find that the preponderance of the evidence showed that Castleberry was the procuring cause of the subject sale.
¶ 26. We find Sudeen's affirmative defense that he did not purchase the property prior to the November 1, 1996 deadline because he was not able to secure the necessary financing is not relevant to the issue of whether the ultimate sale was a "new deal" and the issues relating to that question.

II. DID THE COURT ABUSE ITS DISCRETION IN AWARDING PREJUDGMENT INTEREST OF 8% FROM THE DATE OF THE SALE?
¶ 27. An award of prejudgment interest is discretionary with the court. Sunburst Bank v. Keith, 648 So.2d 1147, 1152 (Miss.1995). In addition, prejudgment interest may be awarded to the prevailing party for breach of contract. Warwick v. Matheney, 603 So.2d 330, 340 (Miss.1992). We do not therefore find that the chancellor abused his discretion in awarding prejudgment interest.

III. DID THE COURT ERR IN NOT FINDING THAT THE ORIGINAL AGREEMENT HAD BEEN AMENDED SO THAT CASTLEBERRY REALTY WAS TO RECEIVE $25,000 AS A COMMISSION RATHER THAN $48,000?
¶ 28. Sudeen asserts that he owes Castleberry Realty $25,000 at most as opposed to $48,000 for commission. He apparently arrives at this conclusion from a statement in the initial contract signed on May 24, 1996, for purchase which required that Sudeen deposit $50,000 earnest money with Castleberry Realty. That contract stated that one-half, or $25,000, of the earnest money would be retained by the broker if the purchaser failed to perform the terms of the contract. Twenty-five thousand dollars was released to the governor as consideration for the first extension. When Sudeen asked for a second extension to the initial contract, the governor required that he pay him another $25,000 as consideration for that extension. Sudeen then asked Castleberry to release the remaining $25,000 of the original $50,000 that Castleberry had deposited to his brokerage account to the governor. Because that $25,000 was to serve as compensation to Castleberry for liquidated damages in case of default, Castleberry required that Sudeen sign a letter to him stating that Sudeen would compensate him $25,000 if he defaulted on the purchase of the property. That letter was dated September 5, 1996 and stated, "This is to certify that in case of default on behalf of the buyer to go to an act of sale with the property owned by Mr. Edwin Edwards, the realtor fees of $25,000 (twenty-five thousand U.S. dollars) will be paid by the buyer." The $25,000 to which Sudeen refers was to serve as compensation to Castleberry in case of default and was clearly not intended as realtor's commission for the sale of property. We therefore find that there is substantial supporting evidence for the court's finding that there was no amendment to the initial contract regarding the amount of the realtor's commission. "Findings of fact made by a chancellor which are supported by credible evidence, may not be set aside on appeal." Allgood v. Allgood, 473 So.2d 416, 421 (Miss.1985).
¶ 29. We have reviewed Anderton v. Business Aircraft, Inc., 650 So.2d 473 (Miss.1995), and do not find those facts similar to those in the case at bar as asserted by Sudeen in his brief. That case was in regard to a summary judgment and *248 explicitly regarded negotiations to modify the amount of realtor's fees.

IV. DID THE COURT ERR IN FINDING THAT CASTLEBERRY REALTY DID NOT ACT IN THE CAPACITY OF DUAL AGENT?
¶ 30. Sudeen complains that the court failed to consider that Castleberry had attempted to act in a dual agency role and in so doing violated Miss.Code Ann. § 73-35-21(1)(e) (Rev.2000). We will not burden this opinion with a lengthy discussion on this issue. Suffice it to say that the governor himself testified in his deposition that he explicitly told Mr. Castleberry from the outset that he would not be responsible for any real estate fees or commissions and Castleberry himself also testified to that fact. In addition, the fact that the governor later listed the property with a different realtor is persuasive evidence that Castleberry was not acting as his agent and there was therefore no dual agency. As the chancellor noted in his order denying Sudeen's motion to reconsider, there was no evidence presented to indicate or infer that Castleberry listed or attempted to sell the property to anyone other than Sudeen. Though Sudeen presented as evidence certain documents stating that Castleberry Realty represented the buyer, these were shown to be unsigned preprinted working drafts of the initial contract. Thus, there was no evidence presented to support the claim of a dual agency other than Sudeen's mere assertion. "Findings of fact made by a chancellor which are supported by credible evidence, may not be set aside on appeal." Allgood v. Allgood, 473 So.2d 416, 421 (Miss.1985).

V. DID THE COURT APPLY THE WRONG STANDARD OF REVIEW WHEN IT FOUND THAT SUDEEN REQUESTED ASSISTANCE IN OBTAINING FINANCING OR THAT HE WAS UNABLE TO PROVIDE FINANCING FOR THE INITIAL CONTRACT?
¶ 31. Sudeen argues that because Castleberry, as the appellee, did not plead or attempt to prove that Sudeen had the financial support to close the transaction within the time period of the original contract and refused to do so in an effort to defraud that he, Sudeen, did not have the obligation to prove by clear and convincing evidence that he was not financially capable of closing within that time frame. He argues that the court erred in requiring this of him and refers to the following statement made in the opinion of the lower court:
Defendant did not prove to the Court an inability to secure financing for the real estate purchase, as he attempted to prove in his defense of the payment of such commission. Defendant, further, did not prove by clear and convincing evidence that he requested assistance in obtaining such financing from Plaintiffs nor did he prove that the Plaintiffs were or would have been unable or unwilling to provide assistance in his obtaining financing for the real estate purchase.
¶ 32. We concede that the correct standard of proof for the defendant is the "preponderance of the evidence" standard, not the "clear and convincing evidence" standard. The preponderance of the evidence is the common law standard of review for contract breaches involving an intentional wrong. Paracelsus Health Care Corp. v. Willard, 754 So.2d 437, 447-48 (¶ 53) (Miss.1999). However, this language was corrected by the court in the corrected judgment, and it further stated that it was satisfied after review that the correct standard was applied and met. The record shows that the evidence supports the correct standard. Though Sudeen and his associates testified to their *249 repeated but unfruitful efforts to obtain financing, there was no loan application or other documentation submitted to support their assertions. In addition, Sudeen testified that ultimately financing was no problem. "Findings of fact made by a chancellor which are supported by credible evidence, may not be set aside on appeal." Allgood, 473 So.2d at 421.
¶ 33. At trial Sudeen attempted to justify his course of action by claiming that he was unable to obtain financing to pay Edwards and he criticized Castleberry for not assisting him in his efforts to obtain financing. However, as Sudeen himself points out in his brief, we do not find this defense relevant to the theory of the plaintiff's case, that it was entitled to a realtor's commission because it was the procuring cause of the sale of the property, and it can therefore not provide the basis for reversible error. It is our opinion that the relevance of the chancellor's comment regarding Sudeen's ability to obtain financing was in regard to the issue of punitive damages, though not expressly stated.

VI. DID THE COURT ERR IN AWARDING PUNITIVE DAMAGES AND ATTORNEY'S FEES?
¶ 34. The trial court found that Sudeen's breach of contract was willful and wanton and evidenced his intentional disregard for Castleberry's rights under his contract with him. The law in Mississippi is settled that punitive damages are recoverable in an action for breach of contract. Polk v. Sexton, 613 So.2d 841, 845 (Miss.1993); Fought v. Morris, 543 So.2d 167, 173 (Miss.1989). The trial court relied on Polk v. Sexton, 613 So.2d 841 (Miss.1993), in rendering its judgment and opinion regarding the issue of punitive damages. Polk reaffirms that punitive damages are recoverable in breach of contract cases "where such breach is attended by intentional wrong, insult, abuse, or such gross negligence as amounts to an independent tort." Id. at 845. Punitive damages, however, are appropriate "only in extreme cases," and should be awarded only with "caution and within narrow limits." Bryant v. Alpha Entertainment Corp., 508 So.2d 1094, 1098 (Miss.1987). The award of punitive damages and the amount, however, is within the discretion of the trier of fact. Polk, 613 So.2d at 845.
¶ 35. The accepted theory regarding exemplary or punitive damages permits their imposition as a punishment upon the wrongdoer, or as a restraint on the transgressor. Yazoo & Miss. Valley Railroad Co. v. May, 104 Miss. 422, 426, 61 So. 449, 450 (1913). Such damages are assessed as a warning and example to deter not only the offender but others similarly situated from committing like offenses in the future. West Bros., Inc. v. Barefield, 239 Miss. 530, 542, 124 So.2d 474 (1960). What is otherwise a windfall is deemed necessarily granted to the plaintiff as his reward for public service in bringing the wrongdoer to account. Neal v. Newburger Co., 154 Miss. 691, 700, 123 So. 861, 863 (1929). Fraud has become a principal basis for an award of punitive damages. Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454, 461 (Miss.1983).
¶ 36. The trial court, in its order denying Sudeen's motion to reconsider, stated:
Plaintiffs are real estate agents and would generally not be viewed as a group of individuals likely to befall harm due lack of arms length dealing in the contracts with which they are associated. However, when such contracts involve multi-million dollar corporate dealings with international business people trained in the arts of "wheeling and dealing" and obtaining the best possible *250 deals and prices under both the stresses of immediate time constraints and in procuring lengthy delays, such a category of individuals is in need of protection from harm. It is the opinion of the Court that such breach of contract actions as have warranted punitive damage awards and have been upheld by our Supreme Court are not limited to areas other than real estate contracts.
We construe this statement to mean that the lower court in essence found that Sudeen intentionally delayed closing on the Edwards property as a strategy for his own benefit and that it would not allow Sudeen to employ this strategy to the detriment of Castleberry as the realtor. Being mindful that our standard of review will not permit that the finding of the trier of fact be disturbed on appeal if there is substantial supporting evidence, Dungan v. Dick Moore, Inc., 463 So.2d at 1100, we now look to the facts for such evidence.
¶ 37. Sudeen struggles mightily to defend his numerous delays in closing as an affirmative defense by explaining that they were a result of his inability to obtain financing. We believe that the lower court looked upon evidence regarding Sudeen's efforts to obtain financing not as an affirmative defense, but as evidence providing insight as to Sudeen's credibility and business practices and their impact on the issue of bad faith and punitive damages. We note that Sudeen's testimony regarding financing was supported only by his assertions and those of his associates. It was never corroborated with testimony of bankers with whom he applied or documents introduced into evidence in the form of a loan application. The court concluded that the delays were part of Sudeen's strategy in his dealings. A chancellor has the authority and the responsibility to assess the credibility of witnesses. Estate of Taylor, 609 So.2d 390, 393 (Miss.1992). The court's conclusion that financing was not really a problem is also supported by the fact that Sudeen came up with $100,000 deposit in only twenty-four hours when Edwards had another buyer.
¶ 38. Sudeen's testimony did not serve to enhance his credibility on several other occasions as well. In an effort to disarm Castleberry of any effectiveness Sudeen testified that in the end he himself negotiated with the governor far more effective terms than Castleberry was able to negotiate for him. Sudeen neglected to mention that the initial agreement included considerable property that was excluded in the final agreement. In addition, Governor Edward's deposition testimony regarding the final terms made it clear that the final offer was a matter of giving Sudeen the opportunity to match the same offer the governor had received from a prospective purchaser procured through Ford Realty. Governor Edwards did not indicate that he had any negotiations with Sudeen himself regarding the final terms of purchase. Furthermore, the governor testified that the only reason he gave Sudeen the opportunity to match the offer was because of the ongoing relationship he had had with Sudeen. It is uncontested that this ongoing relationship was initiated by Castleberry.
¶ 39. In addition, the court was mindful that Sudeen was a sophisticated and well-heeled entrepreneur with enough savvy to broker a multi-billion dollar project; yet, after having signed three documents acknowledging that he owed Castleberry Realty $48,000, Sudeen testified that he did not expect to see Castleberry at the closing because he thought no broker was involved in the transaction.
¶ 40. The record also is supportive that there were also credibility problems with the testimony of Sudeen's associates. Nevertheless, we find enlightening the testimony *251 of Cruthird, Sudeen's closing attorney. He testified that he had had contact with both Sudeen and Edwards from November 1, 1996, the date of the expiration of the second extension, until the actual closing in August 1997, and that during that time he operated under the assumption that "this thing was still in the works" and that the contract was a continuous one. He said the final arrangement was a modification of the original contract. He testified that he always thought Castleberry was the realtor of record and that neither Sudeen nor Edwards or anyone else ever informed him that Castleberry was out of the picture until two to three weeks after the closing. Cruthird said that he expected Castleberry would be at the closing but that Sudeen was shocked that Castleberry there. Cruthird said that he told Sudeen at the closing that he owed Castleberry the realtor's commission and that Sudeen told him he did not have the money to pay him at that time and that it would be paid later. Cruthird testified that he believed he had a legal and ethical duty to provide for Castleberry's fee in the closing and that he had an overriding concern for his own liability to Castleberry. He said that he consented to closing the transaction without Sudeen's providing payment to Castleberry at that time because Sudeen agreed that he would pay Castleberry the commission later and Cruthird would place the amounts into escrow and defer recording the deed until the realtor's fee was paid. It was only after closing that Sudeen obtained his opinion from the Real Estate Commission of Mississippi which provided Sudeen's primary defense to the punitive damage award. However, the record shows that Sudeen's behavior at the closing clearly indicates that he did not intend to pay Castleberry his realtor's commission even then. He made the false promise to pay the commission only because his attorney refused to close otherwise and Sudeen did not want to lose his $100,000 down payment. Sudeen asserts that the Real Estate Commission of Mississippi had rendered a verbal opinion to him that the realtor's fee was not owed. There was no corroboration of this testimony at the trial. It is not difficult to understand that the Real Estate Commission would render an opinion that no realtor's fee was due Castleberry by Sudeen if that opinion was based on a manipulation of the facts as presented and edited by Sudeen on direct examination and in his brief to this Court, that is, upon his conclusion that the final contract upon which the sale was based was a "new deal" and was unrelated to the initial contract for purchase. In addition, we also understand such a conclusion if Sudeen failed to give the Real Estate Commission the same facts that his brief fails to mention regarding the arrangement with Edwards to take possession of the Edwards property on November 1, 1996 when he failed to close after the second extension.
¶ 41. Sudeen's own attorney, Gerald Cruthird, testified that he made it clear to Sudeen that his research showed that the real estate fee was due Castleberry. Sudeen's brief stops short in quoting Cruthird on cross-examination regarding his conversation with Sudeen regarding the realtor's fee:
I looked at further cases and, you know, again, I am up here I guess as an expert from that standpoint, but I felt like that based on my research the commission was due and I told Mr. Sudeen that.
Sudeen had the opinion of his own attorney who was personally familiar with the negotiations from the beginning and he intentionally chose to ignore that opinion for his own personal gain and disregarded Castleberry's rights under the contract. Punitive damages are recoverable in breach of contract cases "where such *252 breach is attended by intentional wrong, insult, abuse, or such gross negligence as amounts to an independent tort." Polk v. Sexton, 613 So.2d. at 845. The chancellor indicated that he was concerned with the protection of realtors dealing with parties whose business practices incorporate delays and extensions as a matter of course. Punitive damages are often assessed as a warning and example to deter not only the offender but others similarly situated from committing like offenses in the future. West Bros., Inc. v. Barefield, 239 Miss. at 542, 124 So.2d at 474.
¶ 42. We also note that Castleberry required evidence of Sudeen's financial status when Castleberry released the second $25,000 for the second extension to the initial contract because that $25,000 was to serve as compensation to Castleberry for liquidated damages in case of default. In response to this request Sudeen supplied a financial statement of Sudeen Pharmaceuticals, which showed a net worth of $7,500,000. However, it was brought out at trial that this amount was expressed in terms of Guyanan dollars and the true value in U.S. dollars was $52,000. There was nothing in the document to indicate that the dollar figure did not represent U.S. dollars.
¶ 43. The trial court relied on Polk v. Sexton, 613 So.2d 841, in rendering its judgment and opinion regarding the issue of punitive damages, which reaffirms that punitive damages are recoverable in breach of contract cases "where such breach is attended by intentional wrong, insult, abuse, or such gross negligence as amounts to an independent tort." Id. at 845. Reviewing the evidence, we find that there is substantial supporting evidence to support the trial court's finding that Sudeen's breach of contract was willful and wanton and evidenced his intentional disregard for Castleberry's rights under his contract with him. The applicable standard of review will not permit that the finding of the trier of fact be disturbed on appeal if there is substantial supporting evidence even if under the same proof we might have found otherwise. The finding of fact may not be set aside unless manifestly wrong. Dungan v. Dick Moore, Inc., 463 So.2d at 1100; Cotton v. McConnell, 435 So.2d at 685. Sudeen testified that his net worth was $2,500,000 and the trial judge awarded $100,000 in punitive damages and attorney's fees. We do not believe this amount to be injudicious. The award of punitive damages and the amount is within the discretion of the trier of fact. Polk v. Sexton, 613 So.2d at 845.
¶ 44. Likewise, the award of attorney's fees is clearly justified in cases where punitive damages are merited. Aetna Casualty & Surety Co. v. Steele, 373 So.2d 797, 801 (Miss.1979). The chancery court stated in its opinion:
Evidence was presented to the Court of a percentage based fee arrangement being made between Plaintiffs and their attorney and no specific award of attorney's fees is made in light of this fee arrangement which has been satisfied to the Court as being reasonable in light of the efforts and amount of time put forth as evidence by Plaintiffs' attorneys in the request for reimbursement of such fees.
In this case the chancellor recognized the percentage based fee arrangement between the plaintiffs and their attorney and chose to award $100,000 to encompass both punitive damages and attorney's fees, which was within his discretion.
¶ 45. THE JUDGMENT OF THE PEARL RIVER COUNTY CHANCERY COURT IS AFFIRMED. STATUTORY DAMAGES AND INTEREST AWARDED TO THE APPELLEES. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
*253 McMILLIN, C.J., PAYNE, BRIDGES, THOMAS, MYERS and CHANDLER, JJ., concur. IRVING, J., concurs in part, dissents in part with a separate written opinion joined by KING and SOUTHWICK, P.JJ.
IRVING, J., concurring in part, dissenting in part:
¶ 46. I agree with the majority that the judgment of the lower court in the amount of $48,000 plus prejudgment interest should be affirmed. However, I do not believe the facts of this case support an award for punitive damages. Accordingly, I dissent from that portion of the majority opinion affirming said award.
¶ 47. It is a giant stretch to conclude that Sudeen's failure to close the loan for more than a year after the initial closing date was due to some diabolical scheme to avoid paying a $48,000 broker's commission. It is true as the majority points out that Sudeen was able to come up with $100,000 in twenty-four hours to save the deal, but it is also true that Sudeen came within three hours of missing the deadline for producing the initial $50,000 earnest money deposit despite having had seventeen days to produce it. Further, it is noteworthy that four closing deadlines came and expired without Sudeen being able to come up with the cash to close the deal. When Sudeen worked out yet a fourth extension and called upon Castleberry to release to the seller the final portion of the earnest money as consideration for the extension, Castleberry became concerned that the deal may not ever close and sought protection of the percentage of the earnest money due him under the terms of the original contract, in case of default by Sudeen. As noted by the majority, Castleberry acquired this protection by way of a separate promissory note from Sudeen.
¶ 48. The seller became convinced that Sudeen could not come up with the cash to close the deal and put the property on the market for sale in February 1997. Clearly, it seems to me, that if Sudeen had the financial ability to close the transaction all along, yet chose to miss deadlines simply to avoid the broker's fee, he would have terminated his scheme and acquired the property when the property went back on the market in February 1997. However, the final agreement for the purchase of the property did not occur until August 11, 1997. Under these circumstances, I do not believe there is substantial evidence, or indeed any evidence, to support the conclusion that the delay in closing the transaction from July 31, 1996, to August 18, 1997, was the result of an intentional scheme on the part of Sudeen to avoid paying a $48,000 realtor fee. Accordingly, I dissent as to the majority's affirmance of the award of punitive damages.
KING AND SOUTHWICK, P.JJ., JOIN THIS SEPARATE WRITTEN OPINION.